OPINION
{¶ 1} Defendant-appellant, Gary R. Tomkalski ("Tomkalski"), appeals his conviction and sentence on one count of aggravated vehicular homicide, a second degree felony in violation of R.C.2903.06(A)(1), and one count of driving with a prohibited concentration of alcohol in bodily substances, R.C.4511.19(A)(5), in the Lake County Court of Common Pleas. The court sentenced Tomkalski to five years in prison for vehicular homicide and to six months in prison for driving with a prohibited concentration of alcohol, to be served concurrently. The court also ordered Tomkalski to pay a mandatory fine of $500.00 pursuant to R.C. 4511.99, imposed post release control up to a maximum of three years, and permanently revoked Tomkalski's license to drive. For the following reasons, we affirm the decision of the court below.
 {¶ 2} At about eleven o'clock on the evening of April 21, 2002, Tomkalski was involved in an automobile accident on Chardon Road in the City of Willoughby Hills, Ohio. Officer Craig Anderson ("Anderson") was the first to arrive on the scene in response to a 911 dispatch. Anderson found two vehicles on the north side of the roadway in front of The Wright Place development. One of these vehicles was a silver Lexus operated by Jay Burton ("Burton"); the other was a Pontiac Grand Am operated by Tomkalski. Tomkalski's girlfriend and business partner, Beth Anne Lurty ("Lurty"), was a passenger in the Grand Am. Anderson approached the Pontiac. Anderson noticed the odor of alcohol coming from the Pontiac. Anderson noticed that Tomkalski was moving lethargically and trying to put an arm around Lurty. Lurty was unconscious. Anderson checked Lurty's pulse, but found none. Anderson then radioed dispatch to report a possible fatality.
 {¶ 3} Tomkalski and Lurty were transported by ambulance to Richmond Heights Hospital in Cuyahoga County, Ohio. Lurty was pronounced dead upon her arrival at Richmond Heights Hospital.
 {¶ 4} Other officers arrived on the scene and interviewed witnesses. Burton told the officers that he had been traveling westbound on Chardon Road while the Pontiac was approaching eastbound on Chardon. Burton said that the Pontiac crossed into his lane and that he had swerved off the road in order to avoid a collision. Burton's Lexus struck the Pontiac's passenger side with its left front corner just north of the roadway. Anderson testified that the yaw marks on the roadway and the location of the vehicles corroborated the account of the accident as given by Burton.
 {¶ 5} Another witness, Brian Pelligrini ("Pelligrini"), reported to the officers at the scene that he had been driving eastbound on Chardon Road when the Pontiac passed him at a very high rate of speed. Recognizing the Pontiac at the accident scene, Pellingrini pulled over to make a statement to police.
 {¶ 6} Officer Matt Naegele ("Naegele") was dispatched from the accident scene to Richmond Heights Hospital in order to investigate the possible role of alcohol in causing the collision. Upon arrival, Naegele was admitted to the emergency room and was informed of Lurty's death. Naegele found Tomkalski being treated by emergency room staff. Naegele asked Tomkalski how he felt. Tomkalski replied that his shoulder hurt. Naegele then read Tomkalski his Miranda rights and asked if Tomkalski understood. Tomkalski replied that he did and that he wanted to speak with Naegele. Naegele asked if Tomkalski had been drinking that evening. Tomkalski replied that he had had six or seven beers that evening. In the course of his interview with Tomkalski, Naegele was able to smell the odor of alcohol coming from Tomkalski's mouth. Naegele also noticed that Tomkalski's eyes were red and glassy and that his speech, although coherent, was slightly impeded.
 {¶ 7} Naegele read Tomkalski Ohio Bureau of Motor Vehicles Form 2255 which details the consequences, pursuant to R.C.4511.191, of refusing to submit to a chemical test for the presence of alcohol in the body. Naegele then requested that Tomkalski submit to a blood or urine test. Tomkalski refused. Thereafter, Naegele submitted a written request to the attending physician, pursuant to R.C. 2317.02, for the results of any test administered to Tomkalski to determine the presence of alcohol in his blood. The result of a blood test administered by the hospital revealed that Tomkalski's blood alcohol content was .250 mg/dL.[1] Naegele obtained the results of the blood test that evening and left the hospital without issuing any citation to Tomkalski.
 {¶ 8} On September 23, 2002, Tomkalski was charged under a five-count indictment with causing Lurty's death and driving under the influence of alcohol. Tomkalski filed a motion to suppress the state's evidence on the grounds that the state lacked probable cause to arrest Tomkalski and that the state failed to comply with the requirements of R.C. 4511.19 and4511.191 in obtaining the results of Tomkalski's blood alcohol test. Hearings on Tomkalski's motion were held on January 10 and on February 5, 2003. Tomkalski subsequently filed the transcripts of the suppression hearings with the court and also filed three volumes of transcripts from preliminary hearings. The state moved to strike the preliminary hearing transcripts. The court granted the state's motion on April 16, 2003.
 {¶ 9} On April 29, 2003, the trial court denied Tomkalski's motion to suppress. On May 7, 2003, Tomkalski entered a written no contest plea to the charges of aggravated vehicular homicide and driving with a prohibited concentration of alcohol in bodily substances. The remaining charges against Tomkalski were dismissed. Tomkalski was sentenced on June 11, 2003. This appeal timely follows.
 {¶ 10} Tomkalski raises the following assignments of error.
 {¶ 11} "[1.] The trial court erred in granting the state's motion to strike the preliminary hearing transcript.
 {¶ 12} "[2.] The trial court erred in denying the defendant's motion to suppress evidence of tests upon the defendant's blood.
 {¶ 13} "[3.] The trial court erred in ruling that the defendant was not illegally arrested and refusing to suppress the fruits of that illegal arrest.
 {¶ 14} "[4.] The trial court erred in ruling that the defendant was not interrogated in violation of his rights under the Miranda decision.
 {¶ 15} "[5.] The trial court erred in not sentencing the defendant to the minimum sentence authorized by law."
 {¶ 16} In the first assignment of error, Tomkalski argues that the trial court erred by striking the preliminary hearing transcripts since "the evidence contained therein was reliable[, a] great portion of the evidence at the preliminary hearing was admitted by and adopted by the State, * * * [and t]he remaining evidence was given under oath and subjected to adversary testing by the State." The state argues that the trial court properly struck the transcripts of the preliminary hearing as these transcripts constituted inadmissible hearsay.
 {¶ 17} An appellate court's review of a lower court's decision to admit or exclude evidence is limited to whether the trial court abused its discretion. State v. Finnerty (1989),45 Ohio St.3d 104, 107. "A trial court abuses its discretion when it acts in an unreasonable, arbitrary or unconscionable manner. A reviewing court should not substitute its judgment for that of the trial court." Id. citing State v. Jenkins (1984),15 Ohio St.3d 164, 222.
 {¶ 18} Preliminary hearing testimony, when admitted for the truth of the matter asserted, constitutes inadmissible hearsay. Evid.R. 802. Preliminary hearing testimony may be admissible under the exceptions to the hearsay rule or when a witness is unavailable and the testimony bears adequate indicia of reliability. Evid.R. 804(B)(1); Ohio v. Roberts (1980),448 U.S. 56, 66 (discussing the admissibility of preliminary hearing transcripts as an exception to the hearsay rules).
 {¶ 19} In the present case, Tomkalski sought the admission of the complete preliminary hearing transcripts by filing them with the court without seeking the court's leave and without any explanation of the purpose for their admission. Moreover, the court had already held two days of hearings on Tomkalski's motion to suppress. At these hearings, Tomkalski had ample opportunity to introduce these transcripts as evidence. Instead, Tomkalski attempted to introduce the transcript a month later by including them in the filing of the suppression hearings transcripts. In these circumstances, the trial court was under no obligation to accept the preliminary hearing transcripts into evidence and did not abuse its discretion by striking them. Tomkalski's first assignment of error is overruled.
 {¶ 20} In his second assignment of error, Tomkalski maintains that the trial court erred by denying the motion to suppress the evidence of the blood alcohol test taken at Richmond Heights Hospital. At a suppression hearing, the trial court acts as the trier of fact. Ravenna v. Nethken, 11th Dist. No. 2001-P-0040, 2002-Ohio-3129, at ¶ 13, citing State v. Mills (1992),62 Ohio St.3d 357, 366. As the trier of fact, the trial court must evaluate the evidence and judge the credibility of the witnesses.Mills, 62 Ohio St.3d at 366, citing State v. Fanning (1982),1 Ohio St.3d 19, 20. "The court of appeals is bound to accept factual determinations of the trial court made during the suppression hearing so long as they are supported by competent and credible evidence." State v. Searls (1997),118 Ohio App.3d 739, 741. Accepting the trial court's determination of the factual issues, the court of appeals must conduct a de novo review of the trial court's application of the law to those facts. Id.; State v. Stiles, 11th Dist. No. 2002-A-0078, 2003-Ohio-5535, at ¶ 11.
 {¶ 21} Tomkalski advances three arguments. In the first argument, Tomkalski takes exception to the trial court's finding that "the State presented sufficient evidence that the Defendant's blood was drawn within two hours of the offense."
 {¶ 22} R.C. 4511.19(D)(1) provides that in a prosecution for driving with a prohibited concentration of alcohol in bodily substances, "the court may admit evidence on the concentration of alcohol * * * in the defendant's blood * * * as shown by chemical analysis of the defendant's blood * * * within two hours of the time of the alleged violation." In a prosecution under R.C.4511.19, therefore, "the results of a properly administered bodily substances test may be admitted in evidence only if the bodily substance is withdrawn within two hours of the time of the alleged violation." Newark v. Lucas (1988), 40 Ohio St.3d 100, paragraph one of the syllabus; State v. Eschenauer (Nov. 10, 1988), 11th Dist. No. 12-237, 1988 Ohio App. LEXIS 4479, at *8-*9 ("lack of proof [that the test was administered within two hours of the alleged violation], alone, warrants the suppression order").
 {¶ 23} We find that there is competent, credible evidence to support the trial court's determination that Tomkalski's blood was drawn within two hours of the violation. At the suppression hearings, Officer Anderson testified that he received the dispatch to respond to the scene of a motor vehicle collision at approximately five minutes after eleven. Anderson testified that he arrived at the scene within five minutes of receiving the dispatch and that he was the first officer to be present. The actual time of the violation is provided in several of the documents admitted into evidence. The Administrative License Suspension form reported the time of the violation as 11:07 p.m. The Alcoholic Influence Report Form reported the time of "Accident or Violation" as 11:05 p.m. Burton, the driver of the vehicle that collided with Tomkalski, gave a written statement to the police that described the accident as occurring at about "11 PM." Kathleen Streck ("Streck"), the emergency room nurse who drew Tomkalski's blood, testified that she collected the sample at about 11:45 p.m. The toxicology report on Tomkalski's blood states that the sample was collected at 12:08 a.m.[2]
Therefore, even if Tomkalski's blood was drawn at 12:08 a.m., it is well within two hours of the violation that occurred around 11:00 p.m.
 {¶ 24} Tomkalski also argues that the blood alcohol test results must be suppressed because Officer Naegele did not obtain them by means of a records request pursuant to R.C.2317.02(B)(2)(a). This section of the Revised Code provides that, if a "law enforcement officer submits a written statement to a health care provider that states that an official criminal investigation has begun regarding a specified person * * * that requests the provider to supply to the officer copies of any records the provider possesses that pertain to * * * the results of any test administered to the specified person to determine the presence or concentration of alcohol, * * * the provider * * * shall supply to the officer a copy of any requested records the provider possesses." Tomkalski alleges that Naegele obtained the results of the blood test administered by Richmond Heights Hospital prior to submitting a written request.
 {¶ 25} At the suppression hearings, Naegele testified that he submitted a written request for the results of Tomkalski's blood test after Tomkalski refused to consent to have his blood tested pursuant to R.C. 4511.191. A copy of this request was entered into evidence at the hearing. Nurse Steck, however, had already drawn Tomkalski's blood on the order of the attending emergency room physician independent of Naegele's request.[3]
According to the Alcohol Influence Report and the Administrative License Suspension forms filled out by Naegele, Tomkalski refused Naegele's request for a blood test at 11:55 p.m. Both of these forms included the results of the hospital's blood alcohol analysis. Since these forms were purportedly filled out at 11:55 p.m, Tomkalski argues, Naegele could not have known the results of the blood test unless he had illegally obtained this information prior to submitting a written request.
 {¶ 26} Tomkalski's argument is unconvincing. The evidence relied on by Tomkalski only proves that Naegele wrote the results of the blood alcohol test into the reports after he had obtained those results from the hospital. Underneath the result of the blood analysis on the Alcoholic Influence Report, Naegele noted that "[the] hospital later released records of BAC to arresting officer." Moreover, the evidence is undisputed that the hospital laboratory did not finish testing Tomkalski's blood until 12:30 a.m. at the earliest. Until this time, neither the hospital nor Naegele could have been aware of the amount of alcohol in Tomkalski's blood. Finally, we point out that, even if Naegele had obtained the results of the blood alcohol test prior to submitting a written request, this fact does not affect their admissibility as evidence. R.C. 2317.02(B)(2)(a) "does not mandate that a written request be made before such test results can be released, it merely mandates that such test results must be released when a proper request is made." Cleveland v.Rollins, 8th Dist No. 79614, 2002-Ohio-1087, at ¶ 22.
 {¶ 27} Tomkalski's third argument under this assignment of error is that the results of the blood alcohol test should have been suppressed because they were obtained in violation of Tomkalski's constitutional right of privacy. Contrary to Tomkalski's assertion, the medical records obtained by Officer Naegele are not protected within the constitutional right of privacy. State v. Desper, 151 Ohio App.3d 208, 218-219,2002-Ohio-7176, at ¶¶ 34-36, citing Mann v. University ofCincinnati (May 27, 1997), 6th Cir. Nos. 95-3195, 95-3293, 1997 U.S. App. LEXIS 12482, at *10-*12. Under Ohio law, medical records are protected by the physician-patient privilege. R.C.2317.02(B)(1); General Motors Corp. v. Finklea (S.D.Ohio 1978),459 F.Supp. 235, 239. This privilege does not apply, however, "[i]n any criminal action concerning * * * the results of any test that determines the presence or concentration of alcohol * * * in the patient's blood." R.C. 2317.02(B)(1)(c); State v.Quinones (Feb. 14, 1996), 9th Dist. No. 95CA006084, 1996 Ohio App. LEXIS 470, at *18-*19; State v. Grohowski (Sept. 30, 1996), 6th Dist. No. L-95-292, 1996 Ohio App. LEXIS 4220, at *7. Therefore, the results of a blood alcohol test obtained in the course of a criminal investigation do not violate the suspect's privacy rights. Cleveland v. Dames, 8th Dist. No. 82980, 2003-Ohio-6054, at ¶¶ 3-7; Rollins, 2002-Ohio-1087, at ¶¶ 12-19. Tomkalski's second assignment of error is overruled.
 {¶ 28} In the third assignment of error, Tomkalski argues that the results of the blood alcohol test should have been suppressed because his "arrest" at Richmond Heights Hospital was illegal. Tomkalski maintains that Naegele could not make an arrest at the hospital because Naegele was outside of his jurisdiction and that Naegele lacked probable cause to arrest.
 {¶ 29} We find Tomkalski's argument inapposite in as much as Naegele did not place Tomkalski under arrest at the hospital. The Ohio Supreme Court has identified four requisite elements of an arrest: "(1) An intent to arrest, (2) under real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested." State v. Barker (1978), 53 Ohio St.2d 135, paragraph one of the syllabus. In requesting Tomkalski to submit to a blood or breath test pursuant to R.C. 4511.191, Naegele read Tomkalski the standardized form regarding implied consent, BMV 2255, which begins: "You are now under arrest for operating a vehicle while under the influence of alcohol * * *." Despite these words, Naegele testified that it was never his intent to arrest Tomkalski, that he never restrained Tomkalski, that he did not issue Tomkalski a citation or file charges, and that he left the hospital after obtaining the results of the blood test administered by the hospital. Tomkalski was released from the hospital a couple hours later that same evening in the company of his parents. In these circumstances, where there is abundant evidence that a suspect was not placed under formal arrest, the rote recitation of the implied consent form is insufficient to constitute a valid arrest. Cf. State v. Robeson (July 20, 2001), 11th Dist. No. 2000-P-0013, 2001 Ohio App. LEXIS 3283, at *3-*5 (finding there was no valid arrest where the officer read the suspect the implied consent form and issued a citation but testified that he did not place the suspect under arrest).[4]
 {¶ 30} Moreover, the issue of whether Naegele effected a valid arrest of Tomkalski is irrelevant to the suppression of the results of the blood test. Naegele obtained the results of Tomkalski's blood test pursuant to a records request under R.C.2317.02. As discussed above, R.C. 2317.02(B)(2)(a) mandates that a health care provider turn over a suspect's medical records if "an official criminal investigation has begun." There is no requirement that the suspect be placed under arrest prior to requesting the medical records under R.C. 2317.02. Where the blood alcohol test is performed by a hospital for medical purposes and the police obtain the results of the test pursuant to a records request, it is not necessary that the suspect first be placed under arrest. State v. Slageter (March 31, 2000), 1st Dist. No. C-990584, 2000 Ohio App. LEXIS 1358, at *9-*10;Middleton v. Newton (1998), 125 Ohio App.3d 540,544-545.[5] Tomkalski's third assignment of error is overruled.
 {¶ 31} In the fourth assignment of error, Tomkalski argues that any statements he made to Naegele during the questioning at Richmond Heights Hospital should have been suppressed. Tomkalski acknowledges that Naegele read him the Miranda warnings prior to questioning. However, Tomkalski maintains that his consent to waive those rights should be deemed involuntary given his condition at the time; having suffered head trauma, being in severe pain, and having just been informed of his girlfriend's death.
 {¶ 32} The Ohio Supreme Court has stated the test of voluntariness as follows: "A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of police coercive conduct." State v. Otte, 74 Ohio St.3d 555, 562,1996-Ohio-108. Before statements may be suppressed as involuntary, there must be a finding that they were the result of "coercive police activity." State v. Dailey (1990),53 Ohio St.3d 88, 91-92, citing Colorado v. Connelly (1986),479 U.S. 157, 170. Without police coercion, other surrounding circumstances will not negate the voluntariness of the statements. Id. at 92; State v. Shaffer, 11th Dist. No. 2001-T-0036, 2003-Ohio-6701, at ¶ 33 (citation omitted). "The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching not on `free choice' in any broader sense of the word." Dailey, 53 Ohio St.3d at 92, citingMoran v. Burbine (1986), 475 U.S. 412, 421.
 {¶ 33} In the present case, there is no evidence of any coercive police activity on the part of Officer Naegele. Naegele testified that, after he read Tomkalski the Miranda warnings, he asked Tomkalski if Tomkalski understood them. Tomkalski said that he did. Tomkalski further stated that he wanted to speak with Naegele. At no point during the subsequent questioning did Tomkalski ask for the questioning to stop or that he be permitted to speak to a lawyer. The record does not support the claim that Tomkalski was in severe pain. Moreover, the record clearly demonstrates that it was not until after Naegele had obtained the results of the blood alcohol test and left the hospital that Tomkalski was informed of Lurty's death. We find nothing in the circumstances surrounding Tomkalski's statements to Naegele regarding his drinking on the evening of April 21, 2002, to support a finding that they were made involuntarily. The fourth assignment of error is overruled.
 {¶ 34} In the fifth and final assignment of error, Tomkalski argues that the trial court erred by not imposing the minimum sentence allowed by law as required by R.C. 2929.14(B). For aggravated vehicular homicide, a second degree felony, an offender may be sentenced from a minimum of two to a maximum of eight years imprisonment. R.C. 2929.14(A)(2). The trial court sentenced Tomkalski to five years imprisonment for aggravated vehicular homicide. Tomkalski argues that the court failed to consider the minimum sentence before imposing a sentence exceeding the minimum allowed by law.
 {¶ 35} In order for a trial court to impose a sentence beyond the statutory minimum for an offense, where the offender has not previously served a prison term, the court must find, "on the record[,] that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." R.C. 2929.14(B)(2). When imposing more than the minimum sentence, the "trial court is required to make its statutorily sanctioned findings at the sentencing hearing." State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165, at paragraph two of the syllabus.
 {¶ 36} At the sentencing hearing in the present case, the trial court stated it found "that the minimum sentence * * * would demean the seriousness of the offense and would not adequately protect the public from future crime." The court elaborated upon these findings as follows: "Mr. Tomkalski, as the prosecutor points out this day was delayed perhaps in coming but with your history it was going to come. * * * [Y]ou went through programs and [they] told you that you're the kind of person that can not use or handle alcohol. And we do not care if you want to drink your life into oblivion just don't get behind the wheel and that was the message that was given to you time and time again. This is your fourth DUI and it resulted in the death of another human being and we all know that alcohol and gasoline do not mix and when you mix the two somebody is going to die * * * and we have to somehow stop this slaughter on the road by people who do not think, do not consider the rights of other persons and go out and drive anyway after they are told don't drive. You're the kind of person that alcohol is poison to you, you can't touch alcohol. But even if you want to touch it do not drive, that's the message we've been trying to give you."
 {¶ 37} Tomkalski does not dispute that the trial court made the proper findings, rather, Tomkalski argues that the record does not "reflect that the trial court first considered imposing the minimum term [and] then relied upon one or both of those express findings to depart from that statutorily mandated minimum."
 {¶ 38} We disagree. By stating that the minimum sentence would demean the seriousness of the offense and not adequately protect the public, the trial court has demonstrated that it did, in fact, consider imposing the minimum sentence on Tomkalski.State v. Gaid, 8th Dist. No. 80873, 2002-Ohio-5348, at ¶ 8 (the trial court's specific finding that "the minimum sentence would demean the seriousness of the offense" evidences that the court first considered imposing the minimum sentence prior to imposing a longer sentence). The fifth assignment of error is overruled.
 {¶ 39} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas, denying Tomkalski's motion to suppress and sentencing Tomkalski to five years imprisonment, is affirmed.
Christley, J., O'Neill, J., concur.
[1] Burton was taken to Lake West Hospital where he voluntarily submitted to a blood alcohol test. No alcohol was found in Burton's blood.
[2] Steck explained the discrepancy in times as follows. She drew the sample on the attending physician's verbal order at 11:45 p.m. The time of 12:08 a.m. given in the toxicology report reflects the time that the attending physician's order was entered into the computer. Valerie Blackwell, the medical laboratory technician who ran the tests on Tomkalski's blood, was present when it was drawn and testified that it was drawn at 11:45 p.m.
[3] There is no evidence in the record to suggest that Richmond Heights Hospital ordered Tomkalski's blood test at Naegele's request. Nurse Steck testified that the blood was drawn on the attending physician's order for the purpose of treating Tomkalski.
[4] Courts are divided whether, in the absence of contradictory evidence, the mere recitation of the implied consent form is sufficient to infer an intent to arrest and a constructive seizure of the suspect. See, e.g., State v. King, 1st Dist. No. C-010778, 2003-Ohio-1541, at ¶¶ 21-23; State v. Rice (1998),129 Ohio App.3d 91, 97-99.
[5] A lawful arrest is essential to the operation of the implied consent statute, R.C. 4511.191, which results in the automatic suspension of the suspect's license, R.C. 4511.191(E), and can create a presumption of intoxication. State v. Rice
(1998), 129 Ohio App.3d 91, 95, citing State v. Risner (1977),55 Ohio App.2d 77, 80.