OPINION
{¶ 1} Appellant, Sonny R. Hatfield, appeals from the judgment of conviction in the Ashtabula County Court of Common Pleas on one count of vehicular homicide, a felony of the fourth degree, in violation of R.C.2903.06(A)(3)(a), and one count of aggravated vehicular homicide, a felony of the second degree, in violation of R.C. *Page 2 2903.06(A)(2)(a). For the reasons discussed herein, we reverse and remand the matter for further proceedings.
 {¶ 2} Facts and Procedural Posture
 {¶ 3} On February 24, 2004, at approximately 5:40 p.m., an automobile accident occurred between a Ford Explorer, driven by appellant, and a Honda Civic, driven by Sharon Kingston, at the intersection of Harold Avenue and Beck, Plymouth, and Plymouth-Brown Roads in Plymouth Township, Ashtabula County, Ohio.
 {¶ 4} The intersection of the four roads can best be described as an offset four-way intersection. Plymouth-Brown Road merges into Beck Road heading in a northern (northwestern) direction and is designed to allow traffic to travel unimpeded between Plymouth-Brown and Beck Roads in either direction. Plymouth Road splits off in a westerly direction (leftward) from where Plymouth-Brown Road merges with Beck. Traffic also flows uninterrupted from Plymouth-Brown Road to its westerly fork (Plymouth Road), but eastbound traffic from the Plymouth Road's Y-shaped intersection with Beck and Plymouth-Brown, is required to stop. A "stop sign ahead" warning sign is posted two-tenths of a mile prior to the point where Plymouth Road intersects with Plymouth Brown and Beck Roads.
 {¶ 5} Harold Avenue heads in an east-west direction (to the right) just northwest of Plymouth Road intersection with Plymouth-Brown and Beck Roads. Westbound traffic on Harold Road is regulated by a stop sign where it intersects with Plymouth-Brown and Beck Roads. Traffic is able to cross the intersection from Plymouth Road to Harold Avenue diagonally across Beck Road. *Page 3 
 {¶ 6} Kingston was traveling in a northwesterly direction from Plymouth-Brown toward Beck Road when the two vehicles collided, with the front and front-left portions of appellant's vehicle striking the driver's side of Kingston's Honda. Following the collision, appellant's SUV came to rest across Beck Road, facing eastward toward Harold Avenue. The force of the impact caused Kingston's vehicle to come to rest in a grass field just north of Harold Road, near the Harold Road stop sign, facing westward toward Plymouth Road.
 {¶ 7} Lorraine Pratt, a licensed practical nurse, who was driving westbound on Harold Avenue with her daughters saw Kingston's vehicle sitting in the field on the right hand side of Harold Avenue with the side "smashed in" and "another car parked on * * * Beck Road * * * facing * * * Northwest." She noticed that the woman in the Honda was "not doing very well" and went to assist her. As she approached to examine Kingston, she found her "dazed," unresponsive to verbal cues, and "unable to control her head movements." Pratt also stated that Kingston's "pupils were fixed and dilated." Pratt instructed her oldest daughter to call 9-1-1. When asked if she noticed appellant at the scene, Pratt testified that she first noticed him standing near his vehicle and talking on his cell phone. Pratt described appellant's demeanor following the accident as "very shaken," and that he was pacing back and forth and "moving his hands quite a bit."
 {¶ 8} An EMS crew from the Plymouth Township Volunteer Fire Department was first to arrive on the scene. Bill Allds, Captain of the Plymouth Township Fire Rescue Team, testified that he saw appellant's car sitting across the middle of Beck *Page 4 
Road facing eastward toward Harold Avenue, and saw the vehicle containing the injured female sitting in the field facing westward toward Plymouth Road.
 {¶ 9} Ascertaining that the driver of the car was the more seriously injured, Allds proceeded to the car to evaluate her condition. He noticed that the crash had caused Kingston to become "entrapped in the vehicle" due to "intrusion into the passenger compartment." Allds observed that Kingston was cyanotic. He checked her vital signs and determined that Kinston had died. Based upon Allds' observations, a representative of the Ashtabula County Coroner's Office was subsequently summoned to the scene.[1]
 {¶ 10} While Allds was attending to Kingston, other members of his squad had placed appellant in a backboard and cervical collar and were beginning to evaluate his injuries. After covering Kingston's vehicle with a blue tarp "to protect the scene as well as the confidentiality of the victim," he proceeded to ascertain appellant's condition and coordinate his treatment.
 {¶ 11} Appellant was transported into the squad vehicle where the EMS squad performed trauma surveys. Allds described appellant's condition as "alert and oriented * * * breathing [and] * * * able to speak to us in full sentences." Although Allds testified that *Page 5 
appellant complained of "blurred vision, headache and being shaky," his exam results were otherwise "unremarkable," i.e., a slight rise pulse rate and blood pressure, which were findings one would "normally expect for somebody * * * involved in a motor vehicle crash." Appellant was subsequently placed upon a cardiac monitor and given two IV's, which Allds described as "standard practice," and then transported to ACMC for further evaluation and treatment.
 {¶ 12} While the Plymouth Township EMS was attending to the accident victims, representatives from the Ohio State Highway Patrol arrived to investigate the scene of the accident. Trooper Tye Tyson was the first patrolman to arrive on the scene. He was joined shortly thereafter by Trooper Jayson Hayes and Sergeant John Altman. Trooper Tyson proceeded to perform a field sketch of the accident scene and to investigate the scene. Trooper Tyson described the condition of the roadway that evening as "dry" and the weather conditions as "partly cloudy, 35 degrees with no adverse conditions." When asked how he found the vehicles, Trooper Tyson testified that appellant's vehicle was in the middle of the roadway at the intersection facing northwest, whereas the vehicle in the field was "facing in a * * * southwesterly direction." Trooper Tyson observed that there were no tire markings in the roadway, save for "markings * * * north of Harold Road where the Honda Civic had slid off the road," and that there were "no brake marks or anything." Trooper Tyson also testified as to his examination and measurement of a fluid trail left by appellant's vehicle, and plotting of the debris field left by both vehicles involved in the accident, explaining that the debris field shows "which direction the debris were flying after the accident," and provides *Page 6 
information as to which direction the force of the accident occurred. Further investigation of the accident revealed that Hatfield was driving under a suspended license.
 {¶ 13} After completing his investigation of the accident scene, the findings of which were included in the Highway Patrol's official report, Trooper Tyson proceeded to the ACMC to interview appellant regarding the accident. When Trooper Tyson arrived to speak with appellant, he was in Emergency Care at ACMC. Trooper Tyson testified that when he first arrived to meet with appellant, appellant's mother was present.
 {¶ 14} Prior to taking appellant's written statement, Trooper Tyson read appellant his Miranda rights. Tyson then handed appellant a form and requested that he write his own interpretation of the crash. Tyson testified that appellant was able to comply with Tyson's request without difficulty.
 {¶ 15} In his handwritten statement, which was admitted into evidence at trial, and to which Tyson testified, Hatfield reported that he "was turning left off of Plymouth Road and a small white car was coming straight over the hill and we had a head on collision." Next, Tyson asked appellant a series of questions, which he recorded on the report, along with appellant's responses as follows:
 {¶ 16} "Q: You were on Plymouth Road and turning left off of Plymouth Road?
 {¶ 17} "A: Yes, sir.
 {¶ 18} "Q: Did you stop at the stop sign on Plymouth Road?
 {¶ 19} "A: I don't remember. I looked right and went to turn and hit the white car. Was there a stop sign there? There's not one there, is there? *Page 7 
 {¶ 20} "Q: Did you notice the white car before you hit it?
 {¶ 21} "A: I didn't see the car. There is a dip and you can't see that way?
 {¶ 22} "Q: About how fast were you going?
 {¶ 23} "A: I was going 45, but I slowed down for the turn, so probably about 20 to 25.
 {¶ 24} "Q: So, you didn't hit your brakes or steer away?
 {¶ 25} "A: No, I was turning left and then the collision.
 {¶ 26} "Q: Do you remember using a turn signal?
 {¶ 27} "A: Yes.
 {¶ 28} "Q: Are you familiar with the area?
 {¶ 29} "A: Yes, not very though, enough to get around.
 {¶ 30} "Q: Do you know the owner of the vehicle that you were driving?
 {¶ 31} "A: Yes, it's my vehicle but I haven't got the title switched over yet.
 {¶ 32} "Q: When did you buy the vehicle?
 {¶ 33} "A: One and a half to two months ago.
 {¶ 34} "Q: Were you on the phone at the time of the accident?
 {¶ 35} "A: No.
 {¶ 36} "Q: You knew that your license was suspended?
 {¶ 37} "A: Yes.
 {¶ 38} "Q: Did Keith (Haynes, the vehicle's prior owner) know that your license was suspended?
 {¶ 39} "A: No. *Page 8 
 {¶ 40} "Q: Is the vehicle insured under anyone's name?
 {¶ 41} "A: I don't think so.
 {¶ 42} "Q: Was your seat belt on?
 {¶ 43} "A: No.
 {¶ 44} "Q: What are your injuries?
 {¶ 45} "A: Dizzy spells, lower back, bad headache.
 {¶ 46} "Q: Were you drinking any alcoholic beverages this evening?
 {¶ 47} "A: No, sir.
 {¶ 48} "Q: Did you take any narcotics, marijuana, medication?
 {¶ 49} "A: No, sir.
 {¶ 50} Trooper Tyson then asked if appellant would be willing to submit to a blood test. At first, he agreed, but after disclosing to Trooper Tyson that he uses "drugs and alcohol" and that "[i]t may be in [his] system from yesterday," he retracted his consent.
 {¶ 51} Tyson then contacted Sergeant Altman and informed him that appellant refused to consent to a blood test. Altman showed up at the hospital shortly thereafter to speak with appellant and obtained a second written statement, in the form of a question and answer session, from him. After giving his statement, appellant reviewed and signed it without any changes. Sergeant Altman characterized appellant's demeanor during questioning as "coherent" and stated that appellant understood what he was being asked, did not seem to have slurred speech, and did not seem to be injured or in pain. *Page 9 
 {¶ 52} Sergeant Altman's questions and appellant's answers regarding how the accident occurred were substantially similar to those in Trooper Tyson's interview. However, appellant responded to additional questioning regarding his drug and alcohol use as follows:
 {¶ 53} "Q: Have you had any alcohol or drugs today?
 {¶ 54} "A: Yes, I was at a party last night.
 {¶ 55} "Q: What time did you go to the party?
 {¶ 56} "A: Around 12:00 a.m. or 1:00 a.m. on February 24, 2004.
 {¶ 57} "Q: What time did you leave the party?
 {¶ 58} "A: Before 6:00 a.m.
 {¶ 59} "Q: Where was it?
 {¶ 60} "A: Ashtabula.
 {¶ 61} "Q: How much alcohol and drugs did you consume?
 {¶ 62} "A: Half an ounce of marijuana, seven to eight lines of cocaine, eight to nine mixed drinks.
 {¶ 63} "Q: Over what time frame?
 {¶ 64} "A: From 12:00 a.m. or 1:00 a.m. until I left before 6:00 a.m.
 {¶ 65} "Q: How much sleep did you have today?
 {¶ 66} "A: From about 6:30 a.m. till about 2:00 p.m.
 {¶ 67} "Q: Did you have any drugs or alcohol from the time you left the party until now?
 {¶ 68} "A: No. *Page 10 
 {¶ 69} "Q: Did you consume any alcohol or drugs from the time of the crash until Trooper Tyson talked to you?
 {¶ 70} "A: No.
 {¶ 71} "* * *
 {¶ 72} "Q: Do you feel you were impaired at the time of the crash?
 {¶ 73} "A: No.
 {¶ 74} "Q: How regularly do you smoke marijuana?
 {¶ 75} "A: Every day.
 {¶ 76} "Q: How regularly do you do cocaine?
 {¶ 77} "A: A few times a week.
 {¶ 78} "Q: How regularly do you consume alcohol?
 {¶ 79} "A: Four or five times a week.
 {¶ 80} "Q: Do you usually drive after drinking or doing drugs?
 {¶ 81} "A: No.
 {¶ 82} Subsequent to this second interview, Sergeant Altman asked appellant for permission to take a blood sample, and appellant agreed.
 {¶ 83} With appellant's consent, two blood samples were taken by Crystal Severino, R.N., at 9:29 p.m., and again at 10:06 p.m., using the Ohio State Highway Patrol's standard-issue Biological Specimen kit. The samples were sent to the Ohio State Highway Patrol Crime Lab, where they tested negative for the presence of alcohol and positive for the presence of cocaine. Appellant was released from the hospital after 11:00 p.m. that evening, after he elected not to stay for further observation. *Page 11 
 {¶ 84} On July 23, 2004, appellant was charged, by way of indictment, with one count of vehicular homicide, a felony of the fourth degree, in violation of R.C. 2903.06(A)(3)(a) and one count of aggravated vehicular homicide, in violation of R.C. 2903.06(A)(2)(a). On August 19, 2004, appellant appeared for his arraignment and entered a plea of not guilty to the charges.
 {¶ 85} On November 22, 2004, appellant filed a motion to suppress "all oral and written statements" given to law enforcement personnel and a motion in limine to prohibit the state from using the results of his blood tests at trial. On February 24, 2005, appellant filed another motion in limine to prohibit the state from using "any testimony concerning any admissions" by appellant regarding "cocaine, marijuana, alcohol or drug use" prior to the accident. On March 4, 2005, the trial court overruled appellant's motions following a hearing.
 {¶ 86} On July 8, 2005, appellant filed another motion in limine to prohibit the state from introducing evidence of his prior driving record and any photos of Sharon Kingston taken at the scene of the accident. On October 14, 2005, appellant filed yet another motion, this time to "prohibit use of evidence" taken from the crime scene, all testimony with regard to his demeanor on or about February 24, 2004, all statements made by the defendant and "all other evidence that [the state] intends to use."
 {¶ 87} On March 30, 2006, the trial court ruled on the aforementioned motions. With regard to appellant's motion in limine to exclude evidence of his prior driving record, the trial court sustained the motion in part to exclude general proof of prior traffic convictions, but to allow evidence of "the status of Defendant's driving privileges on the *Page 12 
date of [the] incident, and [any] felony traffic convictions within the past ten years," but overruling the motion with regard to the admission of photographs of the victim. The trial court overruled appellant's "motion to prohibit use of evidence."
 {¶ 88} On May 3, 2006, appellant again moved the court to exclude evidence of the blood analysis, based upon State v. Mayl,106 Ohio St.3d 207, 2005-Ohio-4629. The trial court overruled this motion on May 11, 2006.
 {¶ 89} The case went to a three day trial before a jury on June 16, 2006. After polling the jury, appellant was found guilty of both counts of the indictment. On June 19, 2006, appellant was sentenced to eight years in prison for aggravated vehicular homicide and eighteen months on the vehicular homicide charge, with the sentences to run concurrently, and concurrent with a sentence previously imposed for a conviction for trafficking in marijuana in Case No. 2005 CR 167. In addition, the trial court imposed a lifetime suspension of appellant's driver's license.
 {¶ 90} Appellant timely appealed his judgment of conviction, raising the following assignments of error:
 {¶ 91} "[1.] Evidence of Cocaine and its metabolites that were found in two samples of blood that were taken from appellant roughly four hours after an accident between him and Sharon Kingston and admission of cocaine use at least seven hours prior thereto were not relevant to any of the issues that were before the trial court. Even if they were, their probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues and of misleading the jury. *Page 13 
 {¶ 92} "[2.] The blood that was removed from appellant on the evening of February 24, 2004 and whose analysis [sic] was introduced at trial over defense counsel's objection was not handled and examined in substantial compliance with standards that are established by the Ohio Department of Health.
 {¶ 93} "[3.] The State of Ohio failed to produce an expert witness to prove that cocaine and cocaine metabolites that were found in two samples of blood that were removed from appellant at 9:29 p.m. and 10:06 p.m. on February 24, 2004 along with his admissions of cocaine use could have had anything to do with his driving abilities at the time that he had an accident roughly four hours or more prior thereto.
 {¶ 94} "[4.] Evidence of driving suspensions that had expired prior to the date that appellant had an accident with Sharon Kingston wasn't relevant to any of the issues that were involved in the case that he was on trial for [sic]. Even if it was, its probative value was substantially outweighed by the dangers of unfair prejudice, of confusion of the issues and of misleading the jury that heard this case.
 {¶ 95} "[5.] Appellant's constitutional rights were violated when the trial court gave a special instruction to the jury immediately after the defense rested its case without appellant taking the stand.
 {¶ 96} "[6.] Appellant's constitutional rights under the Fifth and Sixth Amendment were violated when the trial court refused to allow him to admit the investigative report [of] defense witness Douglas Heard and his Curriculum Vitae into Evidence.
 {¶ 97} "[7.] The trial court below refused to dismiss the second count of appellant's indictment for Aggravated Vehicular Homicide in violation of R.C. *Page 14 2903.06(A)(2)(a) because it was not a lesser included offense of the first count of vehicular homicide in violation of R.C. 2903.06(A)(3)(a).
 {¶ 98} "[8.] Two written statements were taken involuntarily from Appellant in violation of his constitutional rights.
 {¶ 99} "[9.] Two samples of Blood were taken from appellant in violation of his constitutional rights.
 {¶ 100} "[10.] Appellant's rights were violated by remarks made by Ashtabula County Prosecutor Thomas Sartini during rebuttal argument in which he gave his personal opinion as to appellant's guilt.
 {¶ 101} "[11.] Appellant's conviction of Aggravated Vehicular Homicide in violation of Revised Code 2903.06(A)(2)(a), as alleged in Count 2 of his indictment, is neither supported by sufficient evidence nor is it supported by the manifest weight of the evidence.
 {¶ 102} "[12.] Appellant's constitutional rights to a fair trial were violated by the impact of numerous cumulative errors.
 {¶ 103} "[13.] R.C. 2903.06(A)(2)(a) and R.C. 2903.06(A)(3)(A) are allied offenses of similar import and even though appellant could be indicted on both, he could only stand convicted and sentenced on one of these offenses."
 {¶ 104} For ease of discussion, we will address appellant's assignments of error out of order.
 {¶ 105} II. Suppression and Other Related Issues *Page 15 
 {¶ 106} Under his eighth assignment of error, appellant argues that the two written statements, taken by Trooper Tyson and Sergeant Altman on the evening of February 24, 2004 should have been suppressed because of the injuries he had sustained and "the alcohol and drugs he consumed" approximately 15 and 21 hours earlier that day rendered such statements involuntary.[2] We disagree.
 {¶ 107} The mere fact that an individual is questioned in a hospital setting and may be in pain when questioned, is insufficient, without evidence of police coercion, to render an otherwise voluntary statement involuntary. See State v. Tomkalski, 11th Dist. No. 2003-L-097,2004-Ohio-5624, at ¶ 31-33; State v. Bowshier (Oct. 16, 1992), 2d Dist. No. 2898, 1992 Ohio App. LEXIS 5268, *11; State v. O'Linn (Mar. 16, 2000), 8th Dist. No. 75815, 2000 Ohio App. LEXIS 1064, *14. Moreover, intoxication, even if proven, is an insufficient basis to exclude a voluntary statement absent coercive police activity. State v.Smith, 80 Ohio St.3d 89, 112, 1997-Ohio-355.
 {¶ 108} In this case there is no evidence that appellant's statements were a result of "coercive police activity." The evidence shows that the officers' questioning took place over a brief time frame and that each written statement was two pages in length. Appellant was given an opportunity to review the statements he made to the officers and make corrections prior to signing the forms. Appellant made no corrections to the statements, and signed the forms. Furthermore, even though Trooper Tyson explained appellant's Miranda rights (which appellant understood and duly waived), at no time *Page 16 
during questioning did appellant ask officers to stop or ask that he be permitted to speak with a lawyer.
 {¶ 109} In view of the totality of the circumstances, there is no evidence to support appellant's claim that his statements were involuntarily. Therefore, appellant's eighth assignment of error is without merit.
 {¶ 110} Under his ninth assignment of error, appellant argues that the evidence gleaned from the two blood samples should have been suppressed since his condition rendered him "incapable of consent," and also because the blood samples were taken pursuant to Hatfield's "involuntary statement" regarding his alcohol and drug use. Again, we disagree.
 {¶ 111} It is well-settled that the extraction of blood at the behest of authorities involves a search and seizure of the individual involved. See, e.g., State v. Sweinhagen (Nov. 7, 1989), 3d Dist. No. 4-88-3, 1989 Ohio App. LEXIS 4244, *3. Thus, with regard to blood testing, "[t]he burden is on the state * * * to demonstrate a voluntary consent to a warrantless search." State v. King, 1st Dist. No. C-010778, 2003-Ohio-1541, at ¶ 24 (citation omitted). In the context of consensual searches and seizures, the state is required to demonstrate "that the consent was in fact voluntarily given, and [was] not the result of coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances." Schneckloth v. Bustamonte
(1973), 412 U.S. 218, 248-249.
 {¶ 112} For the same reasons as expressed in our analysis of appellant's eighth assignment of error, we reject appellant's contention that his consent to blood testing *Page 17 
was involuntary. We further point out that, prior to administering the tests, Crystal Severino, a Registered Nurse on duty in the AGMC Emergency Room that evening, stated appellant was "coherent enough to understand what was going on" and "stable as far as his vital signs." There is no evidence indicating appellant was incapable of consenting or otherwise compelled by the officers to submit to the tests. Based upon the totality of the circumstances, the state met its burden in establishing that appellant voluntarily consented to have blood samples drawn, and the court did not err in allowing this evidence to be admitted on this basis. Accordingly, appellant's ninth assignment of error is without merit.
 {¶ 113} Under his second assignment of error, appellant challenges the admissibility of the blood evidence on another front. He specifically attacks the admission of the results of his blood tests, arguing that the trial court's admission of this evidence was prejudicial error, since the state offered no evidence of compliance with administrative code provisions, promulgated by the Ohio Department of Health for the collection and handling of blood, as required by the Ohio Supreme Court's holding in Mayl, supra. We disagree.
 {¶ 114} In Mayl, the Supreme Court of Ohio held that "[w]hen the results of blood * * * tests are challenged in an aggravated-vehicular-homicide prosecution that depends upon proof of an R.C. 4511.19(A) violation, the state must show substantial compliance with R.C. 4511.19(D)(1) and Ohio Adm. Code Chapter 3701-53 before the test results are admissible." Id. at paragraph one of the syllabus. *Page 18 
 {¶ 115} In the instant matter, the rule of Mayl is not invoked since the prosecution did not rely upon proof of a violation of 4511.19(A). Appellant was prosecuted pursuant to R.C. 2903.06(A)(2)(a) (requiring proof that the death was caused "[r]ecklessly"), not R.C.2903.06(A)(1)(a) (requiring proof that the cause of the death of another while operating a motor vehicle was "the proximate result of committing a violation of division (A) of section 4511.19 of the Revised Code."). As the underlying aggravated vehicular homicide charge did not require proof of an R.C. 4511.19(A) violation, a Mayl analysis was inconsequential.
 {¶ 116} Notwithstanding this conclusion, the state did lay a proper foundation for the admission of the blood samples. Specifically, Nurse Severino testified that she collected the blood samples using the standard Highway Patrol issue Biological Specimen collection kit, followed "the procedure according to the directions, initialed and dated the relevant samples and forms and gave the samples to the requesting officer."
 {¶ 117} Further, Trooper Tyson, who was ultimately responsible for the chain of custody of the samples, testified that he filled out and signed the standard property control form which came with the sample kits, as required, and personally mailed it to the Highway Patrol's crime lab in Columbus.
 {¶ 118} In addition, Jeff Turnau, a criminalist with the Ohio State Highway Patrol Crime Lab in Columbus, who tested the first sample for the presence of alcohol,[3] *Page 19 
testified that he followed all relevant procedures with regard to the handling, testing, and documentation of the sample in question. Also, Rebecca Schanbacher, a criminalist with the crime lab who tested both samples for the presence of controlled substances, testified she followed all relevant procedures regarding the handling, testing, and documentation of the samples in question.
 {¶ 119} Since a proper foundation was laid for the admission of the evidence, the trial court did not abuse its discretion in admitting appellant's blood test results. Appellant's second assignment of error is without merit.
 {¶ 120} III. Jury Instructions Relating to Expert Testimony
 {¶ 121} Under his fifth assignment of error, Appellant argues that the trial court erred by giving a jury instruction regarding his expert witness' opinion that was in violation of his Fifth Amendment right not to testify and his due process rights, since "the instruction was * * * an unjustified comment on the exercise of Appellant's right not to be a witness at all," as well as on his right to call witnesses on his behalf. We disagree.
 {¶ 122} For purposes of appellate review, "[t]he decision to issue a particular jury instruction rests within the sound discretion of the trial court." State v. Huckabee (Mar. 9, 2001), 11th Dist. No. 99-G-2252, 2001 Ohio App. LEXIS 1122, *18. A single jury instruction must not be considered in isolation but must be viewed in the context of the instructions as a whole. State v. Price (1979), 60 Ohio St.2d 136, at paragraph four of the syllabus.
 {¶ 123} The trial court admitted the testimony of appellant's expert Douglas Heard regarding the cause of the accident. Heard, a crash reconstructionist, offered the *Page 20 
following opinion as to how the accident occurred: "Mr. Hatfield was traveling on Beck Road * * * approaching the intersection at Harold Road as the Honda Civic was coming in the opposite direction, and at that intersection of Harold Road, he attempted to make a left-hand turn onto Harold into the left front corner and side of the Honda Civic operated by Mrs. Kingston." When asked by defense counsel the grounds upon which he based his opinion, aside from the post-impact resting position of the vehicles, his own review of the evidence provided by the prosecution, and his observation of the damage to the front of appellant's vehicle, Heard replied that he based his opinion on the "statements from Mr. Hatfield."
 {¶ 124} The foregoing testimony was admitted, despite the fact that it relied, in large part, on appellant's statement to Heard about how the accident occurred, which directly contradicted the evidence and the testimony of the state. Appellant did not testify in his own defense. As a result, the trial court gave the following special instruction to the jury at the close of the case:
 {¶ 125} "There is some special instruction that I'm going to be required to give you at this point * * *.
 {¶ 126} "The first thing is, a defendant in a criminal case has a Constitutional right not to testify. Therefore, you must not draw any inference of guilt from the fact that the defendant did not testify in this case.
 {¶ 127} "On the other hand, there is an expert witness who has testified in this case that he considered certain things that the defendant told him that are not otherwise in evidence. *Page 21 
 {¶ 128} "In evaluating the opinion of any expert witness, you mustconsider whether the facts on which the expert based their opinion havebeen established by, at least, a preponderance of the evidence.
 {¶ 129} "Therefore, in deciding the weight to give to the expert opinion, you may consider the extent to which the opinion is based on facts that have not been put into evidence. However, you must be careful to limit this consideration to the evaluation of the opinion of the expert. You must not consider this in any way as suggesting any inference of guilt of the defendant." (Emphasis added).
 {¶ 130} This language, by itself, would seem to indicate that the trial court erred by including an instruction that may cause "the jury to confuse the burden of proof necessary for defendant's conviction."State v. Brown (1982), 7 Ohio App.3d, 113, 115. However, the statement on which appellant's expert relied, was not a fact "necessary for his conviction." Thus, we see no error.
 {¶ 131} Furthermore, we hold the jury instructions, when reviewed in their totality, were sufficient notwithstanding the potentially problematic directive relating to the expert's testimony. The trial court instructed that "[t]he defendant is presumed innocent until his guilt is established beyond a reasonable doubt." The trial court explained the reasonable doubt standard. The jury was informed, on more than one occasion, of appellant's constitutional right not to testify and the fact that no inference of guilt could be drawn based upon his decision not to testify. The court explained that the portions of the expert opinion were based upon facts not in evidence. This instruction was appropriate since Evid.R. 703 prohibits an expert from basing an expert opinion upon *Page 22 
"facts which are not formally in evidence or personally perceived by that expert." Hager v. Norfolk W. Ry. Co., 8th Dist. No. 87553,2006-Ohio-6580, at ¶ 39. Pursuant to the Ohio Jury Instructions, the trial court instructed the jury appropriately as to the weight to be given to expert testimony. 4-405 OJI § 405.51(3). Based upon the foregoing, we cannot conclude that the trial court abused its discretion in providing the aforementioned special instruction. Appellant's fifth assignment of error is therefore without merit.
 {¶ 132} IV. General Evidentiary and Related Issues
 {¶ 133} Under appellant's fourth assignment of error, he argues the trial court's admission of evidence that he was driving under suspension at the time of the accident, as well as his prior record of driving suspensions, was reversible error since the evidence was not relevant to the element of recklessness. We agree.
 {¶ 134} The record indicates that the trial court admitted appellant's driving record from the Ohio Bureau of Motor Vehicles over the objections of defense counsel. The exhibit demonstrated appellant had seven separate license suspensions, two of which were current at the time of the accident. The record also included a letter containing the notice of appellant's current license suspension, dated December 17, 2003. The admissibility of the record was argued twice; first, prior to trial and again when the state sought to admit its trial exhibits. Defense counsel did not object to the admission of the December 17, 2003 letter, but sought to have the remainder of the exhibit disallowed. Alternatively, defense counsel offered to stipulate to appellant's license suspension existing at the time of the accident.
 {¶ 135} In ruling on counsel's objection, the trial court stated: *Page 23 
 {¶ 136} "[T]he argument about whether or not [the admission of the entire exhibit] goes to character, it does not go to character, but nevertheless, the State is required to prove a culpable mental state that includes heedless indifference to the consequences * * *. But I think, it's for the state to prove that this is not just a casual thing, and I think it's relevant and probative that somebody who has a long history of numerous driver's license suspensions who makes a conscious decision on February 24, 2004 to operate a motor vehicle is certainly evidence that a jury ought to be allowed to consider on whether or not that decision to drive a car on that day was taken with heedless indifference to the consequences of fully knowing not just that he had a current active suspension[,] but that he had a history of no right to drive a vehicle at all.
 {¶ 137} "So, I think that it is relevant and the objection is going to be overruled. * * *"
 {¶ 138} Courts in Ohio have held that "[w]here an unintentional killing while in the commission of an unlawful act has been established, it is a further requirement that the violation of the statute must have been the proximate cause of the death. — the killing must be such as would naturally, logically and proximately result from the commission of the unlawful act as defined by the statute * * *." State v. Jodrey (Apr. 10, 1985), 1st Dist. No. C-840406, 1985 Ohio App. LEXIS 6404, at *5; Thus, "evidence of driving under suspension is not relevant to a charge of vehicular homicide or aggravated vehicular homicide," since "both require that the defendant's recklessness or negligence cause the death of another," and "the suspension itself sheds no light on the quality of appellant's driving at the time of the accident." State v. Frommer (Dec. 19, 1985), 4th Dist. No. 577, 1985 Ohio App. LEXIS 10050, at *3; accord,Jodrey, 1985 Ohio App. *Page 24 
LEXIS 6404, at *7 (In the context of an involuntary manslaughter conviction, the appellate court could not "find that the driving under suspension is the proximate cause of a death that occurs when a person drives while under suspension, as reprehensible as that activity certainly is.") Accordingly, the evidence of appellant's multiple license suspensions is in no way probative of appellant's alleged recklessness in causing the victim's death. The introduction of this evidence was improper. Thus, appellant's argument, in this respect, is sustained.
 {¶ 139} While the evidence of appellant's suspensions was not relevant to prove recklessness, evidence of the active suspension was necessary and therefore relevant to increase the severity of the aggravated vehicular homicide charge from a felony three to a felony two. That is, appellant was charged under R.C. 2903.06(B)(3) in Count Two of the indictment, to wit, aggravated vehicular homicide. R.C. 2903.06(B)(3) provides: "[e]xcept as otherwise provided in this division, aggravated vehicular homicide committed in violation of division (A)(2) of this section is a felony of the third degree. Aggravated vehicular homicide committed in violation of division (A)(2) of this section is a felony of the second degree, if, at the time of the offense, the offender was driving under a suspension imposed under [R.C] 4510 * * *."
 {¶ 140} This court has held "any factor that serves to elevate the degree of a crime is not a sentencing enhancement, but rather an element of the crime which must be proven beyond a reasonable doubt." State v.Greitzer, 11th Dist. No. 2003-P-0110, 2005-Ohio-4037, at ¶ 47. Thus, evidence of the active suspension was a necessary element of the state's case. *Page 25 
 {¶ 141} Here, the defense attempted to admit, by stipulation, that appellant was driving with a suspended license at the time of the offense or admit the portion of State's Exhibit J containing the letter informing appellant of his current license suspension. As discussed above, the court rejected this proof and allowed evidence of appellant's seven license suspensions to go to the jury.
 {¶ 142} In Old Chief v. United States (1997), 519 U.S. 172, the United States Supreme Court determined that a defendant's conviction must be reversed where a past conviction is an element of the offense for which the defendant is on trial and the state refuses to accept a defendant's stipulation regarding the conviction. Id. at 174. In reaching this conclusion, the Court reasoned that because it is a defendant's legal status that is at issue, the defendant's stipulation satisfied the element of the offense charged. See Id. at 186. The Court underscored that its holding represented a limited exception to the general principle that "the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence way." Id. at 189. With respect to this general rule, the Court observed:
 {¶ 143} "A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it. People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard. A convincing tale can be told with economy, but when economy becomes a *Page 26 
break in the natural sequence of narrative evidence, an assurance that the missing link is really there is never more than second best." Id.
 {¶ 144} However, "this recognition that the prosecution with its burden of persuasion needs evidentiary depth to tell a continuous story has * * * virtually no application when the point at issue is defendant's legal status, dependent on some legal judgment rendered wholly independently of the concrete events of later criminal behavior charged against him." Id. at 190. Accordingly, Old Chief bars evidence of prior convictions offered solely to prove a defendant's status as a convicted criminal. Under circumstances where a defendant's legal status must be proved, the probative value of a defendant's admission and stipulation to a prior conviction has equivalent value to a fuller record with less potential for prejudice thereby justifying a limitation on prosecutorial discretion. Id. at 190-191.
 {¶ 145} Pursuant to R.C. 2903.06(B)(3), a defendant who had the status of an unlicensed driver by virtue of an active license suspension at the time of the offense can be convicted of a second degree felony under the principle statute if the state proves the defendant's status beyond a reasonable doubt. Appellant offered to stipulate to this status but was disallowed. Instead, the court permitted the prosecution to put forth evidence of appellant's driving history in the form of seven past convictions for driving under suspension. The court's action flies directly in the face of the Supreme Court's carefully reasoned opinion in Old Chief.
 {¶ 146} The admission of appellant's history of convictions for driving under suspension serves as a textbook instance of the problemOld Chief was designed to *Page 27 
prohibit. In overruling defense counsel's objections, the trial court determined that the driving history was admissible to show appellant's actions were "not just a casual thing." Put another way, the history was admitted to illustrate appellant had a propensity to behave in defiance of the law which, in the court's view, would allow for an inference of "heedless indifference" or recklessness. Admitting the record for the purpose articulated by the trial court allowed the jury to generalize appellant's earlier bad acts into evidence of appellant's bad character which raised the likelihood that the jury will convict appellant for crimes other than those charged or, perhaps even worse, convict because appellant is a "bad person" deserving punishment. Id. at 181.
 {¶ 147} "The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime.'" Id., quoting, Michelson v. UnitedStates (1948), 335 U.S. 469, 475-476. Such a maneuver is procedurally illegitimate because such evidence tends to "weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." Id. Under the circumstances, the admission of appellant's entire record of suspensions created an environment in which the jury's verdict could very likely have been premised upon improper considerations.
 {¶ 148} Pursuant to Old Chief, we hold the trial court's evidentiary ruling was an abuse of discretion. The state, in refusing to accept the stipulation, violated the Supreme Court's holding in Old Chief. For these reasons, appellant's fourth assignment *Page 28 
of error has merit and appellant's convictions must be reversed and remanded for a new trial.
 {¶ 149} Next we shall address appellant's first and third assignments of error since they are mutually concerned with the relevance of certain evidence and testimony admitted at trial.
 {¶ 150} Under his first and third assignments of error, appellant asserts his statement admitting that he "did seven to eight" lines of cocaine between 12:00 a.m. and 6:00 a.m. on February 24, 2004, was irrelevant to the issue of whether he was reckless at the time of the accident. Further, even if it was relevant, appellant asserts that its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and of misleading the jury. Appellant points out that the state failed to produce evidence that his cocaine use would have influenced his driving abilities at the time of the accident. Thus, the jury was left to infer that because he used cocaine between 11 and 17 hours before the accident, he must have been under its influence and therefore acting in a reckless manner.
 {¶ 151} "Relevant evidence is `evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" State v. DeRose, 11th Dist. No. 2000-L-076, 2002-Ohio-4357, at ¶ 15, quoting Evid.R. 401. However, even where evidence is relevant, it is inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Evidentiary rulings rest with the sound discretion *Page 29 
of the trial court. State v. Long (1978), 53 Ohio St.2d 91, 98. The court's ruling on such matters will not be disturbed absent an abuse of discretion which affects a material prejudice upon the defendant. Id.
 {¶ 152} An abuse of discretion consists of more than an error of law or judgment; rather, it implies the court's attitude is unreasonable, arbitrary or unconscionable. Berk v. Matthews (1990), 53 Ohio St.3d 161,169 (citation omitted). Reversal under an abuse of discretion standard is not warranted merely because an appellate court disagrees with the trial court's resolution. Id. On the contrary, reversal is appropriate only if the abuse of discretion renders "the result * * * palpably and grossly violative of fact and logic [so] that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." State v. Jenkins (1984), 15 Ohio St.3d 164, 222 (citation omitted).
 {¶ 153} R.C. 2903.06(A)(2)(a), the aggravated vehicular homicide statute at issue herein, prohibits a motorist from recklessly causing the death of another while operating or participating in the operation of a motor vehicle. "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result * * *." R.C.2901.22(C).
 {¶ 154} In an effort to prove the element of recklessness, the state used (1) appellant's admission that he had ingested seven or eight lines of cocaine between 12:00 a.m. and 6:00 a.m. on the day in question and (2) the results of appellant's blood tests showing the existence of cocaine metabolites in his system. The state theorized that appellant's awareness that he ingested cocaine between 11 and 17 hours earlier *Page 30 
showed a heedless indifference or a perverse disregard to a known risk, viz., that the cocaine's effects would influence his driving ability such that an accident was likely.
 {¶ 155} This court has held "that a defendant is charged with knowledge that driving under the influence of cocaine constitutes credible evidence that a defendant is acting recklessly." State v.Adams, 11th Dist. No. 2003-L-110, 2005-Ohio-1107, at ¶ 31 (emphasis added). With respect to the issue of relevance, we hold the trial court did not err in admitting appellant's admissions and his blood test results. The blood tests were probative of whether appellant was under the influence of cocaine at the time of the accident and thus tended to prove appellant was acting recklessly in operating a motor vehicle at the time of the accident. Thus, the trial court did not err in admitting the tests.
 {¶ 156} However, the inquiry does not end with this conclusion. Specifically, the state put forth evidence demonstrating appellant had ingested cocaine within the previous 11 to 17 hours and established the presence of metabolized cocaine in appellant's system. Appellant's admissions and the objective evidence of cocaine in appellant's system demonstrate that the state put forth some evidence to allow the jury to infer he was under the influence of the drug at the time of the accident. However, the state did not connect this evidence to appellant's state of mind at the time of the accident. The average juror does not possess the pharmacological and/or biochemical knowledge to formulate a reliable opinion regarding the lasting effects of cocaine on a user's body.
 {¶ 157} Under the circumstances, the evidence of appellant's cocaine use and the evidence of the blood tests were relevant and sufficient to meet a minimal threshold of *Page 31 
proof to establish the requisite mens rea. However, we hold, given the state of the evidence, a reasonable jury could not conclude, beyond a reasonable doubt, that appellant was under the influence of the drugat the time of the accident. Thus, the state failed to create a reasonable causal nexus between this evidence and appellant's state of mind at the time of the accident.
 {¶ 158} Appellant's first and third assignments of error have merit.
 {¶ 159} In light of the foregoing conclusion, we shall next address appellant's eleventh assignment of error. Under this assigned error, appellant alleges his conviction for aggravated vehicular homicide was neither supported by sufficient evidence nor the manifest weight of the evidence.
 {¶ 160} "[Sufficiency of the evidence * * * challenges whether the state has presented evidence for each element of the charged offense. The test for sufficiency of evidence is whether, after viewing the probative evidence and the inferences drawn from it, in a light most favorable to the prosecution, any rational trier of fact could find all elements of the charged offense proven beyond a reasonable doubt." State v.Barno, 11th Dist. No. 2000-P-0100, 2001-Ohio-4319, 2001 Ohio App. LEXIS 4280, at *16, citing State v. Jones, 91 Ohio St.3d 335, 345,2001-Ohio-57.
 {¶ 161} Alternatively, a challenge to the manifest weight of the evidence raises a factual issue and involves "the inclination of thegreater amount of credible evidence." State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52 (emphasis sic) (citation omitted). When considering a challenge to the weight of the evidence, the reviewing court must consider all the evidence in the record, the reasonable inferences, the *Page 32 
credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed * * *." Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 162} Pursuant to R.C. 2903.06(A)(2)(a), no person shall recklessly "cause the death of another or the unlawful termination of another's pregnancy" while operating a motor vehicle. As alluded to in our previous analysis, the state put forth adequate evidence of the elements or R.C. 2903.06(A)(2)(a) to send the matter to the jury. Accordingly, the jury had sufficient evidence before it to convict appellant.
 {¶ 163} With respect to appellant's assertion that his convictions were against the weight of the evidence, Section 3(B)(3), Article IV of the Ohio Constitution provides:
 {¶ 164} "A majority of the judges hearing the cause shall be necessary to render a judgment. * * * No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause."
 {¶ 165} The instant matter was tried before a jury. However, the appellate panel deciding this case cannot reach total agreement as to the resolution of the appeal. To reverse and remand the matter based upon the weight of the evidence without a full concurrence of all three appellate judges would be unconstitutional. State v. Miller,96 Ohio St.3d 384, 391, 2002-Ohio-4931. Put differently, even were a majority of this panel to agree with appellant's argument regarding the weight of the evidence, appellant's assignment of error would be nevertheless overruled due to a lack of unanimity on this issue. Id. at 390-391. As we are constitutionally required to overrule *Page 33 
appellant's argument, it is unnecessary for this majority to address the merits of the matter.
 {¶ 166} Appellant's eleventh assignment of error lacks merit.
 {¶ 167} V. Issues Relating to Convictions on Multiple-Counts
 {¶ 168} We next turn to appellant's seventh and thirteenth assignments of error, which will be addressed together. In his thirteenth assignment of error, appellant argues that the two offenses for which he was convicted were "allied offenses of similar import" and thus he should have been convicted only of the "lesser offense," i.e., vehicular homicide. In his seventh assignment of error, appellant argues that the trial court erred to his prejudice by refusing to dismiss the second count of the indictment, (the Aggravated Vehicular Homicide charge) because it is "not a lesser included offense of the first count" (Vehicular Homicide).
 {¶ 169} Under R.C. 2941.25, Ohio's multiple-count statute, the General Assembly intended "* * * to permit a defendant to be punished for multiple offenses of dissimilar import * * * however, [if] a defendant's actions `can be construed to constitute two or more allied offenses ofsimilar import,' the defendant may be convicted (i.e., found guilty and punished) of only one." State v. Rance, 85 Ohio St.3d 632, 636,1999-Ohio-291. (Emphasis sic). However, if a defendant commits offenses of similar import separately or with a separate animus, he may still be punished for both under R.C. 2941.25(B)
 {¶ 170} In Rance, the Court observed that the proper test for determining whether crimes are allied offenses of similar import is as follows: "If the elements of the crimes `"correspond to such a degreethat the commission of one crime will result in the *Page 34 commission of the other, the crimes are allied offenses of similar import."'" Id. at 636, quoting, State v. Jones (1997), 78 Ohio St.3d 12,13, quoting State v. Blankenship (1988), 38 Ohio St.3d 116, 117. (Emphasis added.) In making this assessment, courts must align the elements of each crime in the abstract, not compare them in relation to the specific facts of the case. Rance, supra.
 {¶ 171} A review of the relevant statutes reveal that they "proscribe identical conduct, except for the required culpable mental state: `recklessly' for aggravated vehicular homicide, `negligently' for vehicular homicide." State v. Beasley (Aug. 2, 1995), 1st Dist. No. C-940899, 1995 Ohio App. LEXIS 3176, *3-*4.
 {¶ 172} "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." R.C.2901.22(C).
 {¶ 173} "A person acts negligently when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that such circumstances may exist." R.C. 2901.22(D).
 {¶ 174} As is readily apparent from the aforementioned definitions, one cannot act recklessly without also acting with a "substantial lapse from due care," or failing to "perceive or avoid a risk that his conduct may cause a certain result * * * be of a certain *Page 35 
nature * * * or fail to perceive or avoid a risk that such circumstances may exist." Put differently, the commission of aggravated vehicular homicide will necessarily result in the commission of vehicular homicide. Therefore, pursuant to Rance, et al., the commission of one crime will result in the commission of the other and, consequently, the crimes for which appellant was indicted are allied offenses of similar import.
 {¶ 175} Finally, both crimes were a result of the same act and as such, they were not committed separately. Moreover, the term animus, as it pertains to R.C. 2941.25, is defined as "purpose" or "immediate motive." State v. Logan (1979), 60 Ohio St.2d 126, 131. Here, appellant could not have logically committed aggravated vehicular homicide and vehicular homicide with a separate purpose or different immediate motive. Accordingly, the crimes charged involved no separate animus.
 {¶ 176} In sum, the crimes at issue are allied offenses of similar import that were not committed separately and had no separate animus. Thus, appellant could be convicted (found guilty and punished) of only one. Rance, supra, at 136, citing R.C. 2941.25(A). Appellant's thirteenth assignment of error has merit. Because we sustain appellant's thirteenth assignment of error, appellant's seventh assignment of error is rendered moot.
 {¶ 177} VI. Conclusion
 {¶ 178} As a result of the foregoing analysis, appellant's second, fifth, sixth, eighth, ninth, and eleventh assignments of error are overruled. Appellant's first, third, fourth, and thirteenth assignments of error are sustained. Further, given our collective analysis of the sustained assignments of error, we hold appellant's twelfth assignment *Page 36 
of error, alleging cumulative error, is moot. We additionally hold that appellant's tenth assignment of error, alleging prosecutorial misconduct, and sixth assignment of error, alleging crash reconstructionist Douglas Heard's report and CV should have been admitted into evidence, are both moot. Finally, by virtue of our holding on appellant's thirteenth assignment of error, appellant's seventh assignment of error is also rendered moot. Accordingly, the judgment of conviction entered by the Ashtabula County Court of Common Pleas is reversed and the matter remanded for a new trial.
COLLEEN MARY O'TOOLE, J., concurs,
DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.
[1] Richard Morrell, Chief Investigator of the Ashtabula County Coroner's Office, testified that he was summoned to the scene of the accident to perform the investigation into Kingston's death, which included taking photographs and measurements of the scene and transportation of the body to the morgue located at the Ashtabula County Medical Center ("ACMC"). Morrell testified that, as part of his standard procedure, he takes a sample of blood from the victim to be analyzed for alcohol and that Kingston's result from this tox screen were negative. Morrell further testified that after gathering all pertinent information, he is responsible for preparation of the Coroner's verdict, which is then reviewed and approved as is or modified as necessary by the Ashtabula County Coroner. In the instant matter, the Coroner's Verdict determined the cause of Kingston's death was as a "homicide" due to "trauma to the head, trunk and extremities," without the necessity of an autopsy.
[2] Under this assignment of error, appellant argues that his confession was involuntary because of his drug and alcohol consumption; curiously, however, under his first and third assignments of error, appellant inconsistently suggests his drug and alcohol consumption were not a factor in the accident.
[3] Turnau tested only the first sample, which was negative for the presence of alcohol. As a result, the second sample was not tested.