[Cite as *State v. Sanders*, 2009-Ohio-5437.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                  CASE NO.  1-09-01

      v.

MARVIN L. SANDERS,                      O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2008 0289

**Judgment Affirmed**

**Date of Decision:   October 13, 2009**

APPEARANCES:

    *F. Stephen Chamberlain*  for Appellant

    *Alissa M. Sterling*  for Appellee

**PRESTON, P.J.**

{¶1} Defendant-appellant, Marvin L. Sanders (hereinafter "Sanders"), appeals the Allen County Court of Common Pleas' judgment of conviction and sentence on four felony charges. For the reasons that follow, we affirm.

{¶2} On September 11, 2008, the Allen County Grand Jury returned an indictment against Sanders charging him with the following four counts: count one, aggravated robbery with a firearm specification in violation of R.C. 2911.01(A)(1), a felony of the first degree; count two, aggravated burglary with a firearm specification in violation of R.C. 2911.(A)(2), a felony of the first degree; count three, abduction with a firearm specification in violation of R.C. 2905.02(A)(2), a felony of the third degree; and count four, having weapons while under disability in violation of R.C. 2923.13(A)(3), a felony of the third degree. Sanders entered pleas of not guilty to each count.

{¶3} On November 3, 2008, Sanders filed two motions to suppress. In his first motion to suppress, Sanders requested to suppress the identification made through a photographic lineup; and in his second motion to suppress, Sanders challenged the statements he had made to a law enforcement officer. A hearing on both motions was held on November 18, 2008, and subsequently, the trial court overruled his motions.

{¶4} On November 24, 2008, Sanders filed two motions in limine, one dealing with the use of the photographic lineup as evidence, and the other dealing with the use of Sanders' prior criminal record at trial. On November 25 and 26, 2008, the case proceeded to trial before a jury. Prior to the start of the trial, the trial court ruled on the motions in limine, and ultimately denied Sanders' request to prohibit the use of the photographic lineup as evidence, but conditionally granted his request to prohibit evidence regarding any reference to his prior criminal record for the purpose of establishing a "pattern" of conduct.

{¶5} On November 26, 2008, the jury returned verdicts of guilt to all counts as charged in the indictment. A sentencing hearing was held on December 15, 2008, at which time Sanders was sentenced to an aggregate term of twenty-eight (28) years in prison, with three (3) of those years being mandatory for the firearm specifications.

{¶6} Sanders now appeals and raises five assignments of error. We elect to address his assignments of error out of the order that they were presented in his brief.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT COMMITTED AN ERROR PREJUDICIAL TO THE DEFENDANT IN OVERRULING THE MOTION TO SUPPRESS THE PHOTOGRAPHIC LINE UP AND IDENTIFICATION OF THE DEFENDANT.**

**ASSIGNMENT OF ERROR NO. II**

**THE COURT COMMITTED ERROR IN NOT GRANTING THE DEFENDANT'S MOTION IN LIMINE AND PROFFERED WAIVER OF A PRIOR FELONY CONVICTION REQUIRED AS TO COUNT 4, HAVING WEAPONS WHILE UNDER DISABILITY IN VIOLATION OF OHIO REVISED CODE SECTION R.C. 2923.13(A)(3) WHEN ALSO COMBINED WITH AN ERROR IN JURY INSTRUCTIONS.**

**ASSIGNMENT OF ERROR NO. III**

**DEFENDANT WAS DEPRIVED EFFECTIVE ASSISTANCE OF COUNSEL IN THIS CASE BY COUNSEL FAILING TO STIPULATE AS TO DEFENDANT'S PRIOR CONVICTION.**

**ASSIGNMENT OF ERROR NO. IV**

**THE DEFENDANT'S CONVICTION SHOULD BE OVERTURNED DUE TO MISCONDUCT ON BEHALF OF THE PROSECUTOR.**

**ASSIGNMENT OF ERROR NO. V**

**THE DEFENDANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. I*

{¶7} In his first assignment of error, Sanders argues that the trial court erred by overruling his motion to suppress the photographic lineup and identification made by the victim when the lineup was unduly suggestive. Specifically, Sanders claims that when applying the facts presented at the hearing to the applicable test, there were insufficient facts presented at the motion to

suppress hearing which would have justified the trial court's decision to overrule his motion.

**{¶8}** The State responds by arguing that the trial court did not err in overruling Sanders' motion to suppress with respect to the photographic lineup and identification. The State claims that there was sufficient evidence presented to establish that the photographic lineup was not impermissibly suggestive and that the victim's identification of Sanders was reliable.

**{¶9}** A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. See *State v. Carter* (1995), 72 Ohio St.3d 545, 552, 651 N.E.2d 965. When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. *Burnside,* 2003-Ohio-5372, at ¶8. With respect to the trial court's conclusions of law, however, our standard of review is de novo and we must decide whether the facts satisfy the applicable legal standard. *State v. McNamara* (1997), 124 Ohio App.3d 706, 710, 707 N.E.2d 539.

**{¶10}** When a witness has been confronted with a suspect before trial, due process requires that a trial court must suppress the witness's identification of the

suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances. *State v. Murphy* (2001), 91 Ohio St.3d 516, 534, 747 N.E.2d 765. Under this test, the defendant bears the burden of first showing that the identification procedure was unduly suggestive. *State v. Beckham,* 2d Dist. No. 19544, 2003-Ohio-3837, ¶10. If the defendant is able to meet that burden, then the trial court must consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure. Id., citing *State v. Wills* (1997), 120 Ohio App.3d 320, 324, 697 N.E.2d 1072. However, if the pretrial confrontation procedure was not unduly suggestive, any remaining questions as to reliability will go to the weight (not admissibility) of the identification for the trier of fact to decide, and no further inquiry into the reliability of the identification is required. Id.

{¶11} Here, at the suppression hearing, Detective Philip Kleman of the Lima Police Department testified regarding the victim's identification of Sanders. According to Detective Kleman, he started considering Sanders as a possible suspect when the police discovered one of Sanders' fingerprints at the scene of the crime. (Nov. 18, 2008 Tr. at 4). In addition, Detective Kleman stated that Sanders' physical description matched the physical description of one of the suspects who had initially entered the victim's residence and held him at gunpoint.

(Id.). Once Sanders' became a suspect, Detective Kleman testified that another officer found a picture of Sanders in the department's database, then that officer ran the information through the computer, which generated a series of potential pictures that it found similar to Sanders' picture. (Id.). From there, Detective Kleman said that they hand-picked five photographs that they thought most likely resembled Sanders. (Id. at 4-5).

{¶12} On July 14, 2008, Detective Kleman showed the victim the six pictures in a photographic lineup. (Id. at 5). Specifically, Detective Kleman told the victim:

> **I basically tell everyone the same, that is to take your time looking at the pictures. Don't get hung up on lighting conditions. Maybe the length of the hair could be off a little bit, depending on whether they had shaved the day of the crime, or hadn't shaved when the photograph was taken. So, I tell them to focus in on the physical characteristics of the face in particular. You know, I always tell them to take their time and review all six photographs. Don't make no rush decisions.**

(Id. at 5-6). In addition, Detective Kleman testified that neither he nor anyone else did anything or said anything that would have suggested that Sanders was one of the pictures. (Id. at 6).

{¶13} Detective Kleman stated that after looking at the pictures for a short time, the victim picked out Sanders as the suspect who had robbed and assaulted him. (Id.). On cross-examination, while Detective Kleman could not recall the specifics of the physical characteristics the victim had given to the police, which

had been recorded in the police report, he did state that Sanders' physical characteristics were similar to the description the victim had given initially. (Id. at 17). Given the similar characteristics, plus the fact that Sanders' fingerprint had been found and identified at the crime scene, Detective Kleman decided to use Sanders in the photographic lineup. (Id. at 17).

**{¶14}** Upon review of the record, we cannot find that the trial court erred in determining that the photographic lineup was not unduly suggestive. While Sanders argues that there was insufficient evidence to show that the victim's description initially given to the police was accurate or that the victim had had the necessary degree of attention to give a proper description, this argument goes to the victim's reliability, not the photographic lineup procedure. *State v. Wilson*, 2nd Dist. No. 22624, 2009-Ohio-1038, ¶18 (appellant's arguments that the lineup was unduly suggestive went to the reliability of the victim's in-court identification and did not render the lineup from which the victim identified the appellant unduly suggestive). As stated above, the first step in determining whether a photographic lineup and identification should be suppressed is whether the procedure was unduly suggestive. Only if the procedure is found to have been unduly suggestive should a trial court consider the reliability of the victim's identification. *Beckham*, 2003-Ohio-3837, at ¶10.

{¶15} In this case, there was nothing unduly suggestive in the manner in which the photographic lineup was created. The computerized method of creating photospreads avoids most potential unfairness and almost any claim that the lineup was suggestive. *State v. Armstrong*, 2nd Dist. No. 20964, 2006-Ohio-1805, ¶19, citing *State v. Beckham*, 2nd Dist. No. 19544, 2003-Ohio-3837. Here, the photographic lineup was created as a result of both having found Sanders' fingerprint at the scene of the crime, and that his physical characteristics matched the initial description given by the victim. Also, there is simply nothing about the photographic lineup in this case that causes Sanders' photograph to stand out more than the others or would entice the victim to choose his photograph over the others: all the subjects are young black men, with similar hair styles, facial features, skin color, and clothing. (State's Ex. 30). Moreover, neither Detective Kleman's instructions nor the manner in which the lineup was presented to the victim were unduly suggestive. Detective Kleman testified that he told the victim to look at all six photos, to take his time, to focus on the characteristics and not to get hung up on the lighting conditions. In addition, Detective Kleman stated that he did not in any way influence the victim when he met with him and showed him the photographic lineup.

{¶16} Because the photographic lineup and the manner in which it was presented to the victim were not unduly suggestive, there is no need to further

inquire into the reliability of the identification by the victim. *Armstrong*, 2006-Ohio-1805, at ¶20, citing *Beckham*, 2003-Ohio-3837. Therefore, we conclude that the trial court did not err in denying Sanders' motion to suppress the photographic lineup and identification made by the victim.

{¶17} Sanders' first assignment of error is, therefore, overruled.

*Assignment of Error No. V*

{¶18} In his fifth assignment of error, Sanders argues that his convictions are against the manifest weight of the evidence. In response, the State claims that it proved its case through the testimony of various witnesses and admission of physical evidence at trial.

{¶19} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence

and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.

{¶20} Here, Sanders was indicted with the following four counts: count one, aggravated robbery with a firearm specification in violation of R.C. 2911.01(A)(1), a felony of the first degree; count two, aggravated burglary with a firearm specification in violation of R.C. 2911.11(A)(2), a felony of the first degree; count three, abduction with a firearm specification in violation of R.C. 2905.02(A)(2), a felony of the third degree; and count four, having weapons while under disability in violation of R.C. 2923.13(A)(3), a felony of the third degree.

{¶21} Aggravated robbery is defined under R.C. 2911.01(A)(1) and states:

**(A)  No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:**

**(1)   Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.**

Aggravated burglary is prescribed under R.C. 2911.11(A)(2) and states:

**(A)  No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:**

**\* \* \***

> **(2)  The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.**

R.C. 2905.02(A)(2) defines abduction as:

> **(A)  No person, without privilege to do so, shall knowingly do any of the following:**
>
> **\* \* \***
>
> **(2)  By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear.**

Finally, having a weapon while under a disability, is defined under R.C. 2923.13(A)(3), which states:

> **(A) Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:**
>
> **\* \* \***
>
> **(3) The person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been an offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.**

In addition, counts one, two, and three all included firearm specifications pursuant to R.C. 2941.145(A), which provides for a mandatory three-year prison term if it is found that "the offender had a firearm on or about the offender's person or

under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶22} At trial, Officer Andrew Johnson of the Lima Police Department was the first witness called by the State and testified about Sanders' prior felony convictions for trafficking in crack cocaine and possession of crack cocaine. (Nov. 25, 2008 Tr. at 38). Both judgment entries of conviction were thereafter admitted into evidence without any objections from the defense. (Id. at 129); (State's Exs. 25-26).

{¶23} Next, the victim, Randy Lutterbein (hereinafter "the victim") testified that on July 10, 2008, at approximately 8:15 p.m., he was at his home at 211 N. Kenilworth, Lima, Ohio. (Id. at 45-47). He was sitting on his porch reading a newspaper when he was approached by a young black male who pulled out a gun and demanded that the victim give him his money. (Id. at 47-48). When the victim told his attacker that he did not have any money on him, the subject grabbed him and told him to get into his house. (Id. at 48-49). Once inside his house, the victim turned around and saw a second male inside before he was then struck on the head with the gun. (Id. at 50). He was then struck repeatedly on his head and the rest of his body by his initial attacker with the gun, while the other male subject went through his house searching for money. (Id. at 51-52). The

victim testified that he made several attempts to get up or move, but each time he did he would get hit. (Id. at 52). At one point, the victim said that his initial attacker told him that he was going to shoot him. (Id. at 55). The victim stated that he was bleeding so much that he was getting light-headed and thought he was going to die. (Id. at 54-55). Then, the victim said he decided to make-up a story and told his attackers that his father was on his way over and would be there within a few minutes. (Id. at 55). A few minutes later, someone knocked at the door and it became silent. (Id. at 56). Eventually, the victim managed to get the door open, only to discover a third male subject, who tried to force his way into the house and keep the victim from leaving. (Id.). The victim testified that he was able to get past the third attacker, and ran into a neighbor's house, who called the police. (Id. 56-57). Eventually, the victim was taken to a hospital where he was treated for his injuries, which included scrapes and contusions, and he had to get multiple staples for the lacerations to his head. (Id. at 58).

{¶24} The victim said that he then met with Detective Kleman to discuss the case. He said that he was able to provide a description of the suspect who had approached from the sidewalk because there had been nothing to obstruct the suspect's face, as opposed to the other two suspects who had been wearing hoodies over their faces. (Id. at 61). The victim identified his initial attacker as Sanders in both a pre-trial photographic lineup and at trial. (Id. at 61-63). The

victim testified that he had been able to get a good look at his initial attacker, and that this person had also been the one who had pulled the gun on him, forced him inside his house, hit him on the head with the gun, and then repeatedly hit him while he was inside the house. (Id. at 61-63). In addition, the victim said when he had returned to his house after the incident, he noticed that the money he had just cashed from his paycheck was now missing. (Id. at 62).

{¶25} Next, Detective Kleman testified that while he had not been called to the scene on the night of the crime, he was assigned the case and contacted the victim and arranged an interview for July 14, 2008. (Id. at 75). He also stated that while processing the crime scene, another officer had found a fingerprint and identified it as belonging to Sanders. (Id. at 76). Based on this information, he had the officer create a photographic lineup, which he showed to the victim, who identified Sanders as the suspect who had initially attacked him. (Id. at 76-79). With the positive identification by the victim and Sanders' fingerprint at the scene, Detective Kleman obtained an arrest warrant, and Sanders was arrested on July 18, 2008. (Id. at 79).

{¶26} Agent David Hammond, who had been an officer at the Lima Police Department at the time of the incident, testified that he was the officer who had processed the scene on July 10, 2008. (Id. at 98-111). While processing the scene, Agent Hammond testified that he had located blood in several rooms of the

victim's house, the victim's torn bloody t-shirt, a newspaper on the porch, pulled and scattered dresser drawers, and a palm print on an old school desk near the point of exit. (Id. at 98-119); (State's Ex. 1-21, 27-29). Agent Hammond stated that even though he ran the palm print through A.F.I.S. and it had identified Sanders as the most likely match, Agent Hammond still conducted his own individual comparison, which resulted in positively matching the palm print to Sanders. (Id. at 113-19). While Agent Hammond acknowledged that he was unable to tell when the palm print was placed on the victim's school desk, he did state that he looked at the top three matches given to him by the computer program, and was able to positively identify the palm print as belonging to Sanders. (Id. at 119-24).

{¶27} At this time the State's 30 exhibits were entered into evidence, with no objections from the defense, and the State rested. After the defense made a Crim.R. 29 motion for acquittal, which the trial court overruled, the defense then presented its case. The first witness it called was Alexis Sanders. She testified that she was working at Cash's Carry Out on July 10, 2008, until 8 p.m., at which time she left the carry out and went to a party that was occurring at the car wash across the street. (Id. at 133-34). She said that she was familiar with Sanders and remembered him coming over to purchase beer while she was working, and also

remembered seeing him at the party when she went over after work. (Id. at 133-36).

**{¶28}** Next, Shameeka Cloud testified that Sanders' brother, Marvell Sanders, owned the car wash and had thrown her a birthday party on July 10, 2008. (Id. at 140-41). She stated that she had seen Sanders at the car wash and party from 5:00 p.m. to at least 9:00 p.m., and that he had only left once, which was to go to the carry out across the street. (Id. at 145). In addition to Shameeka's alibi testimony, Cala Brown, Cortez Brown, and Andrea Barnett testified that Sanders had been at the car wash and birthday party the night of July 10, 2008, and in fact, had driven them all home around 9:30 p.m. (148-76).

**{¶29}** Damon Glenn, who lived down the street from the victim, testified that on the night of July 10, 2008, he saw two guys over by the fence directly across the street from his house. (Nov. 26, 2008 Tr. at 187). He said that these two individuals came through the fence about twenty minutes later, and that another fifteen minutes later, he heard an ambulance siren and the police arrived. (Id.). Damon testified that he was familiar with both Sanders and his brother, but said that he never saw either one of them that day. (Id. at 188-89). In addition to Damon's testimony, Anthony Goings, who also lived across the street from the victim and was familiar with Sanders, testified that on several prior occasions he

had witnessed several people coming and going from the victim's house, including Sanders and his brother. (Id. at 190-92).

**{¶30}** Then Sanders' brother, Marvell Sanders, testified. He stated that on July 10, 2008, he and Sanders were working at his car wash all day, and then later in the evening, Sanders had stayed for the birthday party at the car wash for Shameeka. (Id. at 195-97). In describing the birthday party, Marvell stated that:

> **[t]here was a lot of, you know, it was like traffic. Some people might come through and get something to eat and might talk around for a minute, or might go across the street and come back and talk and then leave. Some people - - like I say, they wanted their car washed. Some people might want their car washed, * * * It was a whole bunch of people on and off.**

(Id. at 204). At one point in the evening, Marvell said that there were at least forty people at the birthday party, including himself, Sanders, Cala, Andrea, Shameeka, Greg Gilcrease, Legas, Ananias, Mike Anderson, and Elmer Cunningham. (Id. at 204, 208-09). Around 8 p.m., Marvell decided to go back to his house (which is on the same street as the victim's residence), and when he left the car wash Sanders was still there partying and there was still a lot of traffic coming in and out from the party. (Id. at 209). Marvell testified that not five minutes after he had left and arrived at his house, he heard sirens and saw police officers and an ambulance down the street. (Id. at 203).

**{¶31}** Additionally, Marvell said that he knew the victim because the victim had sold him and Sanders drugs on a number of occasions. (Id. at 205).

While Marvell said he no longer did drugs and had only been inside the victim's house a few times, he said that his brother continued to buy drugs from the victim and that he had seen Sanders go into the victim's house numerous times. (Id. at 206). On cross-examination, Marvell acknowledged that he had a criminal record and that Sanders had just gotten out of jail a few months prior to the incident on July 10, 2008. (Id. at 208-11). Nevertheless, Marvell said that when he had left the car wash at 8 p.m., the party was still going and Sanders was still there. (Id. at 209).

{¶32} Next, Sanders took the stand and testified that on July 10, 2008, he had been helping his brother at his car wash all day, and that he had stayed at the birthday party until around 9:30 p.m., at which time he left and drove four other people home. (Id. at 220, 229-31). Sanders stated that he was very familiar with the victim, who he knew as "Jay," because he had been buying cocaine from him since November of 2006. (Id. at 224-26). Sanders also stated that he had been inside the victim's house a number of times, each time to buy drugs from him, and that the last time he had been inside the victim's house was on July 9, 2008, to purchase cocaine. (Id. at 227). On this last visit, Sanders said that the victim confronted him about not paying him the money Sanders owed him from prior drug purchases, which Sanders said was around $2,700. (Id. at 227-28). However, Sanders said that he told the victim that he was not going to pay him

because the cocaine he had been given had been "garbage." (Id. at 228). That was the last time Sanders had seen the victim, because the next day, Sanders was at the car wash helping his brother during the day, then at night, he had stayed for the birthday party. (Id. at 229-31).

{¶33} In response to why his palm print was found in the victim's house, Sanders said that their drug transactions would take place all over the victim's house:

> **I would sit in Randy's front room where his T.V. is sitting at. * * * Sometimes Randy would be standing in the kitchen weighing up whatever he was weighing up. The kitchen is right there, or, the laundry room is right there from the kitchen. * * * I was sitting on that desk before, on top of the desk, watching him do what he's doing right there – getting my stuff together right there. I'm sitting on top of the desk right there. The desk was in the laundry room right here. The kitchen was right there.**

{¶34} Id. at 232-33). Sanders admitted that he had a criminal record, but stated that he had never been convicted of robbery, burglary, or assault; rather, he had prior convictions for possession of crack cocaine, trafficking crack cocaine, and fleeing and eluding. (Nov. 26, 2008 Tr. at 220-22, 233). Because of his past criminal record, Sanders said he was well aware that his fingerprints and picture were part of the police department's computer system, thus he would have never committed the criminal act in the manner the victim had described. (Id. at 234).

{¶35} Finally, Dashanna McClellan was the last witness for the defense and she testified that on July 15, 2008, she had been robbed by "[t]hree black

guys," who had pushed her into her house and held her at gun point while they ransacked her house. (Id. at 248-49). She was never able to identify any of the suspects because she never tried to look at them while they were robbing her and because they were all wearing some kind of disguise. (Id.). Nevertheless, she did state that none of the suspects was Sanders because he has been a friend of her family's for the last 10-15 years, so she would have been able to recognize him if he had been one of the suspects. (Id. at 250-51).

{¶36} Subsequently, the defense rested and the State called three witnesses for its rebuttal. First, the victim took the stand again and testified that while his middle name is "Jay," he has always gone by "Randy." (Id. at 255). In addition, he stated that he does not use or sell drugs, nor has he ever been involved in that sort of a lifestyle. (Id. at 256). Agent Hammond also testified again. He testified that over the years as a crime scene technician he has processed numerous crime scenes where there was drug activity. (Id. at 264). A lot of times he said he will find drug paraphernalia, such as rolling papers, crack pipes, metal mesh, and different sizes of plastic baggies, and sometimes the victim will give him instructions as far as places they do not want searched or processed, implying that they have drugs in those locations. (Id. at 264-65). However, in this particular case, the victim never gave Agent Hammond any limits on where he could or could not search; and while he did not search every single item in the house, he

conducted a thorough search, and never found anything that would have suggested to him that there was drug activity in the house. (Id. at 266-68).

{¶37} Finally, Detective Kleman testified again. He stated that in his investigation he had conducted three separate neighborhood canvases in order to discover whether any of the neighbors knew anything about the victim and his alleged drug activity. (Id. at 272-74). Everyone he spoke to said that the victim was quiet, there was very little traffic coming and going at his house, and that none of them had ever heard anything about the victim engaging in any kind of drug activity. (Id.). Furthermore, Detective Kleman talked to both the Allen County Drug Agency and the Lima Police Department's P.A.C.E. unit, and discovered that the victim's name had never come up as a potential drug dealer. (Id. at 273-74). Based on his investigation, there was never any reason for Detective Kleman to believe that the victim sold drugs. (Id. at 274).

{¶38} Detective Kleman further testified that knowing Sanders' brother was going to be testifying as an alibi witness, he had decided to pull all of the videotapes from the patrol cars from July 10, 2008, in order to preserve any potential evidence from being destroyed. (Id. at 274-75). After hearing all of the defense's alibi witnesses testify during the trial, Detective Kleman went back and looked at the videotapes from the cruisers to see if any of them had been driving past the intersection where the alleged party had been occurring. (Id. at 275). All

of the tapes indicated that there was no traffic coming and going from the car wash where the alleged party had been occurring during the time of the evening when the crime was being committed. (Id. at 274-77, 279-84); (State's Exs. 32, 33, & 34). In fact, at most there were only two cars in the parking lot at the car wash during the time when the alleged party was to have been occurring, but no indication of traffic coming and going from that location. (Id.).

{¶39} After the State's rebuttal, the parties gave their closing arguments, instructions were read to the jury, and subsequently, the jury returned guilty verdicts on all four counts of the indictment and a date was set for sentencing. (Nov. 26, 2008 Tr. at 351-53).

{¶40} Based on the evidence presented at trial, we cannot conclude that Sanders' convictions were against the manifest weight of the evidence. With respect to the aggravated robbery, aggravated burglary, and abduction convictions, even the defense at trial did not dispute that there was evidence that those crimes had occurred against the victim. (Nov. 25, 2008 Tr. at 34); (Nov. 26, 2008 Tr. at 312). With respect to the aggravated robbery conviction, the victim testified that he had been sitting on his porch reading a newspaper when a black male walked up to him, pulled out a gun, and demanded he give him his money. With respect to the aggravated burglary conviction, the victim also testified that his attacker forced him into his house at gun point, and then repeatedly hit him, sometimes

with the gun, while another suspect searched his house for money. With respect to the abduction conviction, there was evidence from the victim that he was forced into the house, had tried to get away, but was constantly hit back to the ground by his attacker, and at one point, was told by his attacker that he was going to be shot. In addition, the admissibility of the judgment entries and Sanders' testimony both illustrated that Sanders' had prior convictions for possession and trafficking of drugs.

{¶41} As stated above, none of these facts were really disputed by Sanders at trial. The main issue was whether Sanders had been the one who had committed those crimes against the victim. However, we believe that there was enough evidence presented to the jury that it was reasonable to believe that Sanders committed those crimes. First of all, the victim identified Sanders as his initial attacker and the one who had repeatedly hit him inside his house, at both a pretrial photographic lineup and at trial. The victim even said that he had gotten a good look at his attacker, because the suspect had walked right up to him and did not have any kind of disguise, unlike the other two suspects who had been wearing hoodies over their faces. In addition, Sanders' palm print had been found and identified at the scene of the crime, and in particular, was found near the point where the suspects had exited the home. There was some testimony that the victim was engaging in drug activities, but the victim denied these allegations, and

the lead detective testified that he was unable to corroborate this allegation, even though he had conducted three separate neighborhood canvases and checked with the local law enforcement drug units. Perhaps the most support for Sanders came from his alibi witnesses who all testified that Sanders was at a birthday party being held at his brother's car wash during the time when the crime was being committed. Nevertheless, there was also testimony from the lead detective, along with physical evidence introduced at trial, that despite these witnesses' testimony, there were at most two cars in the car wash parking lot, but there was not continuous traffic coming and going from that location.

{¶42} Overall, we find that it was within the province of the jury to believe the testimony of the victim, the lead detective, and the physical evidence over Sanders and his alibi witnesses. Moreover, the jury could reasonably infer that Sanders and his witnesses were not being truthful because there were no signs of traffic at the car wash from the police cruisers' videotapes. Viewing all of the evidence, we cannot conclude that the jury clearly lost its way by finding Sanders guilty of aggravated robbery, aggravated burglary, abduction, and having a weapon while under disability.

{¶43} Sanders' fifth assignment of error is, therefore, overruled.

*Assignment of Error No. II*

**{¶44}** In his second assignment of error, Sanders argues that the trial court erred in ruling on his motion in limine with respect to his prior criminal record as it related to an element in count four of the indictment, having a weapon while under disability. Initially, it appears from Sanders' brief that he believes that the trial court should have allowed him to waive his right to have a jury trial on the element of a prior criminal conviction. However, Sanders acknowledges that the current state of the law expressly prohibits waiving an element from the jury. See *State v. Sweeney* (1999), 131 Ohio App.3d 765, 723 N.E.2d 655; *State v. Nievas* (1997), 121 Ohio App.3d 451; 700 N.E.2d 339. Rather, in his brief, Sanders more directly argues that the trial court erred because it allowed this evidence to be introduced at trial and failed to give proper jury instructions at the conclusion of the trial.

**{¶45}** In response, the State argues that while Sanders' argument may have some merit in general application, here his argument is inapplicable because he took the stand and testified. Because Sanders testified at trial and his testimony was subject to the same standards of credibility like any other witness, the State claims that the trial court's jury instructions were not erroneous.

**{¶46}** First of all, we note that the trial court did grant part of Sanders' motion in limine with respect to using his prior conviction for other purposes, such

as those purposes prohibited by Evid.R. 404(B). More importantly, we note that the trial court did not err in ruling on Sanders' motion in limine with respect to allowing evidence of his prior convictions to be used for purposes of establishing an element of the offense in count four. Prior to the start of the jury trial, the trial court held a hearing on Sanders' motion in limine. With respect to the use of his prior conviction, the trial court overruled Sanders' motion "to the extent that the State will be permitted and will be required to prove the element of the prior conviction on count four," but the court granted Sanders' motion as to "other crimes, wrongs, or acts unless there is an exception under 404(B)." (Nov. 25, 2008 Tr. at 4-6.)

{¶47} Count four of the indictment charged Sanders with having a weapon while under disability. This offense is prescribed under R.C. 2923.13(A)(3), which states:

> **(A) Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:**
>
> **\* \* \***
>
> **(3) The person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been an offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.**

Because prior convictions are elements of the crime of having a weapon while under disability, the State must prove them beyond a reasonable doubt. *State v. Richardson*, 3d Dist. No. 13-06-21, 2007-Ohio-115, ¶38. See, also, *State v. Nelson* (Feb. 25, 1999), 8th Dist. No. 73289, at *3, citing *State v. Wright* (June 27, 1996), 8th Dist. No. 69386, appeal dismissed *State v. Wright* (1996), 77 Ohio St.3d 1488, 673 N.E.2d 146. Thus, because proving Sanders had a prior conviction was an element of the crime for which Sanders was charged, not only was it proper for the trial court to have allowed the prior conviction to be admissible, it was required. *State v. Temple* (Dec. 21, 1999), 7th Dist. No. 97-JE-19, at *7.

**{¶48}** Nevertheless, essentially Sanders' main complaint is that in allowing the evidence of his prior conviction to be admissible at trial, the trial court erred by then failing to give adequate jury instructions about the proper use of his prior conviction. Specifically, Sanders argues that the following instruction to the jury was wrong: "[y]ou may also consider a prior record in weighing credibility." (Nov. 26, 2008 Tr. at 342). When looking at the permissible jury instructions regarding the use of a defendant's prior conviction, Sanders argues that none of the instructions allow the jury to consider the defendant's prior conviction in assessing his credibility as a witness.

-28-

{¶49} While it is generally true that a defendant's prior conviction can only be used for a limited purpose, and that it cannot be used to show that he acted in conformity with that character, when a defendant becomes a witness at trial a prior conviction can be used to attack their credibility under Evid.R. 609(A)(2) & (3). In this case, Sanders took the stand and testified on his own behalf and, in fact, admitted to all of his prior convictions, not just the drug charges that were alleged to have put him under disability. (Nov. 26, 2008 Tr. at 220-22). Because he took the stand and testified, his testimony was subjected to the same standards for determining credibility as apply to other witnesses. See 4 Ohio Jury Instructions (2008), Section 409.07; *State v. Hardy*, 8th Dist. No. 86722, 2007-Ohio-1159, ¶¶88-90 (citation omitted). Thus, it was proper for the trial court to have included in its instructions to the jury the statement that it could consider a prior conviction when assessing credibility.

{¶50} Sanders' second assignment of error is, therefore, overruled.

*Assignment of Error No. IV*

{¶51} In his fourth assignment of error, Sanders argues that certain statements made during the prosecution's rebuttal argument at closing amounted to prosecutorial misconduct and constitute reversible error. In response, the State argues that the prosecutor's comments fall within the range of appropriate latitude given to a prosecutor during closing arguments.

**{¶52}** "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. The touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor." *State v. Jones* (2000), 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (internal citations omitted). In opening statements and closing arguments, prosecutors are entitled to some latitude regarding what the evidence has shown and the inferences that can be drawn. *State v. Ballew* (1996), 76 Ohio St.3d 244, 255, 667 N.E.2d 369. "'It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused.'" *State v. Van Meter* (1998), 130 Ohio App.3d 592, 601, 720 N.E.2d 934, quoting *State v. Williams* (1997), 79 Ohio St.3d 1, 12, 679 N.E.2d 646. However, "[a] prosecutor may state his opinion if it is based on the evidence presented at trial." *State v. Watson* (1991), 61 Ohio St.3d 1, 10, 572 N.E.2d 97, abrogated on other grounds by *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112.

**{¶53}** When determining whether a prosecutor's comments amounted to prosecutorial misconduct, an appellate court should consider several factors in making this determination: "(1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*

(1995), 102 Ohio App.3d 28, 41, 656 N.E.2d 970.  The reviewing court should also ask whether the misconduct was an isolated incident in an otherwise properly tried case.  Id.  A prosecutor's misconduct will not be considered grounds for reversal unless the misconduct has deprived the defendant of a fair trial.  Id.

{¶54} In particular, Sanders claims that during the prosecutor's rebuttal argument, she made the following impermissible statement:

> **Prosecutor: Finally, Mr. Benavidez makes an issue out of the fact that we didn't bring in some alibi witness who was supposedly going to say 'you know what, his brother contacted me and wanted me to be an alibi and I said that I don't want any part of that'.  Detective Kleman - - well, Mr. Benavidez gives him a hard time about not bringing that witness in, not putting him on the witness list, and not bringing him in to testify.  Detective Kleman said, "You know what, he refused."  Well, you've got subpoenas.  Well, yes, we do, folks.  But, you know, you guys were all ordered to appear yesterday for jury duty and you did.  But, you heard the Judge say there were a number of people that did not.  Just because you get served with a paper, unfortunately most people aren't like us, and I don't want to say most people, but there are people that aren't like us and don't do what they're told to do.  Secondly, you know, this is probably just unfathomable for this defendant to understand.  But, you know what?  Detective Kleman, as well as all the other detectives that work for this community, yes, we have an obligation to investigate cases and seek justice.  But, I'll tell you, we also have an obligation to other people in this community to ensure their safety.  You heard what this family and what these witnesses that came in here to testify do and what their convictions are.**
> **Shoot, Marvell said he was convicted of violent offenses.  Armed Robbery, folks.  I'd be scared, too.  I wouldn't want to get involved if I didn't have to.**
>
> **Defense: I'm going to object, your Honor.  The testimony was Robbery.  The violence –**

> **The Court: This is closing argument. It's not evidence. The jury is instructed –**
>
> **Defense: I would ask you to. Remind the jury of that again.**
>
> **The Court: The jury is instructed it's not evidence. It's closing argument. The objection is overruled.**
>
> **Prosecutor: My point is, if we don't have to put people's lives in jeopardy we do not. We do not.**

(Nov. 26, 2008 Tr. at 325-26). Sanders claims that in the above statement, the prosecutor implied the following impermissible things: (1) that the defendant and his family are dangerous; (2) that the defendant and his witnesses are not like us; (3) that the defendant and his family strike fear in even the prosecutor; (4) that the State is protecting witnesses from some harm by not having them testify; and (5) that the State, if it did call a witness, then that witness' life would be in jeopardy.

{¶55} However, we do not believe that the prosecutor's comments amounted to prosecutorial misconduct. First of all, when looking at her argument in its entirety, the prosecutor made her comments in response to the defense's allegation that the detective was lying about having a witness who told him that Sanders' brother had asked him to lie to give Sanders an alibi. (Nov. 26, 2008 Tr. at 316). Second, the defense made a timely objection, and while it was overruled by the trial court, the trial court did give a curative instruction to the jury that the comments were not evidence since it was closing argument. Also, this was the

only allegedly inappropriate comment challenged by Sanders in what would be considered an otherwise properly tried case. Finally, and most importantly, based on our prior manifest weight discussion, we cannot find that even if the prosecutor's comments were improper, that they prejudicially affected any of Sanders' substantial rights given the strength of the evidence against him.

**{¶56}** Sanders' fourth assignment of error is, therefore, overruled.

*Assignment of Error No. III*

**{¶57}** Finally, in his third assignment of error, Sanders argues that he was denied effective assistance of counsel because instead of offering to waive his right to a jury trial on the element of having a prior felony conviction (which Sanders admits is prohibited by law), his trial counsel should have offered to stipulate to the existence of a prior conviction in order to avoid the jury learning about the conviction. Sanders claims that because his trial counsel failed to offer a stipulation and the jury learned of Sanders' prior criminal record, he was denied effective assistance of counsel.

**{¶58}** The State counters by arguing that under Ohio law neither the State nor the trial court is required to accept a stipulation offered by a defendant, thus his trial counsel's failure to offer a stipulation rather than a waiver is irrelevant. *State v. Baker*, 9th Dist. No. 23840, 2008-Ohio-1909, ¶¶8-15, appeal accepted for review in *State v. Baker*, 119 Ohio St.3d 1444, 2008-Ohio-4487, 893 N.E.2d 515,

appeal dismissed as being improvidently accepted in *State v. Baker*, 121 Ohio St.3d 1233, 2009-Ohio-1675, 905 N.E.2d 194. Nevertheless, even if there was a requirement to accept a stipulation of an element, such an action falls under the category of a tactical decision, which even if debatable, is not a ground for an ineffective assistance claim. *State v. Post* (1987), 32 Ohio St.3d 380, 388, 513 N.E.2d 754.

{¶59} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole* (2001), 92 Ohio St.3d 303, 306, 750 N.E.2d 148, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶60} In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland*, 466 U.S. at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie* (1998), 81 Ohio St.3d 673, 675, 693 N.E.2d 267. Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965. Rather, the errors complained of

must amount to a substantial violation of counsel's essential duties to his client. See *State v. Bradley* (1989), 42 Ohio St. 3d 136, 141-142, 538 N.E.2d 373, quoting *State v. Lytle* (1976), 48 Ohio St.2d 391, 396, 358 N.E.2d 623. Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373, citing *Strickland*, 466 U.S. 691. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373; *Strickland*, 466 U.S. at 694.

{¶61} At the motion in limine hearing, Sanders' trial counsel attempted to waive his right to a trial by jury as it related to the State's burden in proving the element of a prior conviction in the charge of having a weapon while under disability. (Motion in Limine, Doc. No. 70); (Nov. 25, 2008 Tr. at 2-3). Under the authority of *Sweeney* and *Nievas* the trial court overruled Sanders' counsel's waiver. (Id. at 6). While Sanders' acknowledges that one cannot waive their right to a trial by jury as to an element of an offense, he argues that his trial counsel was ineffective for failing to stipulate to the existence of his prior convictions. In support of his argument, Sanders points to *Old Chief v. United States* (1997), 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574. In *Old Chief*, the United States Supreme Court held that it was an abuse of the trial court's discretion to admit the

judgment record of the defendant's prior conviction into evidence solely for purposes of proving the element of a prior conviction when the defendant had offered to stipulate to its existence. Sanders acknowledges that it is unclear whether *Old Chief* is applicable in Ohio, but because of this uncertainty, he asks this Court to find that a failure to offer a stipulation as to a prior conviction amounts to an ineffective assistance of counsel.[1]

{¶62} We decline to address whether a trial counsel's failure to stipulate to a defendant's prior conviction when it is an element of an offense is unreasonable or deficient under the circumstances. We find that it is unnecessary to discuss the implications of *Old Chief* because either way Sanders has not demonstrated that he was prejudiced by his trial counsel's conduct nor do we believe that he could establish that he was prejudiced by his trial counsel's conduct. In light of the evidence discussed in the manifest weight discussion above and given the strength of the State's case against Sanders, we do not believe that the outcome of the trial would have been different, and our confidence in the outcome has not been undermined by Sanders' allegation of ineffective assistance. *Bradley*, 42 Ohio

---

[1] See *State v. Hatfield*, 11th Dist. No. 2006-A-0033, 2007-Ohio-7130, ¶148 (applying the holding of *Old Chief* and finding the trial court abused its discretion by overruling the defense's motion to stipulate to the defendant's prior licensing suspension); *State v. Simms*, 1st Dist. Nos. C 030138, C 030211, 2004-Ohio-652, ¶7 (stating that if the criminal charge alone had been sufficient to prove the elements of retaliation, then a stipulation might have been appropriate to avoid any undue prejudice and the holding of *Old Chief* would have been applicable); *State v. Kole* (June 28, 2000), 9th Dist. No. 98CA007116, at *4, overruled on other grounds by *State v. Kole* (2001), 92 Ohio St.3d 303, 750 N.E.2d 148 (finding *Old Chief* distinguishable and not applying its holding to the admission of defendant's prior criminal record).

St.3d at 142; *Strickland*, 466 U.S. at 694.

{¶63} Sanders' third assignment of error is, therefore, overruled.

{¶64} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, J., concurs.**

**/jlr**

**ROGERS, J., Concurring Separately.**

{¶65} I fully concur with the majority on the first and fifth assignments of error, and I concur with the result on the second and third assignments of error. I would find them to be moot since the defendant testified as to all his prior convictions, not just the prior conviction that caused his disability. I do believe that a trial court should not only instruct the jury as to those matters for which the prior convictions may be considered (credibility and disability in this case), but also instruct the jury explicitly as to issues on which prior convictions may not be considered (to demonstrate that the defendant acted in conformity with his conduct in prior bad acts, etc.).

{¶66} As to the fourth assignment of error, I would find that there was prosecutorial misconduct. However, I would find that misconduct to be harmless

in this case. It is not clear why the issue of an alleged threat against an alleged potential witness was ever allowed to be presented in this case. It was clearly hearsay and highly prejudicial. That being said, defense counsel aggravated the situation and invited some error by commenting on the State's failure to call that alleged witness during closing argument. The prosecutor then committed the most egregious act by further comment when she speculated on what the attitude of the alleged witness might be if he were required to appear, and then stated: "I'd be scared too." (Trial tr., vol. II, p. 326). While the trial court suggested to the jury that these comments were not evidence, the jury was not explicitly instructed to disregard the comments. I do not believe that the jury would know that the prosecutor's statements as to her personal feelings were improper and irrelevant without being specifically instructed to disregard them by the trial court. However, the standard for reversal on prosecutorial misconduct is very high. In this particular case, I cannot find that the result would have been different without the prosecutorial misconduct, and I must, therefore, find the error to be harmless.

/jlr